## Ellis v. Commonwealth.

(Decided February 13, 1912.)

## Appeal from Pulaski Circuit Court.

1. Criminal Law—Special Term—Powers of Court at.—When a special term of court is properly called, it will be conclusively presumed that there was a necessity for calling it; and at the special term the court has full jurisdiction to take any action that could be taken at a regular term of the court in reference to the indictment and trial of violators of the penal and criminal laws of the Commonwealth.

2. Same—Formation of Jury—Court May Discharge Qualified Jurors—The court may on its own motion discharge jurors who have qualified themselves to sit but who have not been finally accepted by either party. The rulings of the trial court on questions relating to the empaneling of jurors is not subject to exception or review.

3. Same—Evidence—Objection to Incompetent, How Made—Waiver of Error.—If it is desired to save an exception to incompetent evidence that will be available upon appeal, the exception should point out the particular evidence objected to. When objection is made to the whole of the testimony of a witness without specifying any particular part of it, the motion should be overruled if any of it is competent.

4. Same—Evidence—Previous Threats—Competency of.—Evidence of a general threat to do violence to some person or persons, although the declarant may not mention the name of any person, and the witness may not know what person or persons the threat is directed against or has reference to, is competent as showing malice or ill will either general or personal, when, shortly after the threat is made the declarant carries it out by an attack on the person he is being prosecuted for assaulting.

5. Same—Evidence—Declarations of third party in presence of accused.—Although the declarations of a third party to which the accused has not assented might be incompetent, the objection to their competency will be waived if the accused in his evidence adopts and makes part of his testimony the declarations of the third party.

6. Same—New Trial for Newly Discovered Evidence—Error in not Granting May be Reviewed.—A new trial may be granted on the ground of newly discovered evidence, although the evidence is first brought to the attention of the court in a motion for a new trial; and if it appears that the court erroneously refused to grant a new trial, the ruling of the court may be reviewed on appeal.

7. Same—New Trial for Newly Discovered Evidence.—Practice.—The practice as to granting new trials for newly discovered evidence is the same in criminal as in civil cases; and a new trial will not be granted on this ground unless the party asking the new trial in addition to the other requisites files his affidavit set-

ting out that he did not know and by the exercise of reasonable diligence could not have known of the existence of the newly discovered evidence until after the trial had concluded.

8. Same—New Trial for Newly Discovered Evidence.—A new trial will not be granted in any State of case where the newly discovered evidence is merely cumulative, or unless it be of such a permanent and unerring character as to have decisive influence on the evidence to be overturned by it. Nor will a new trial be granted except in rare cases on account of newly discovered evidence which only tends to discredit or impeach an opposing witness.

9. Same—Evidence—Motive for Crime.—It is competent for the Commonwealth to prove the existence of a motive for the commission of the crime, and this may be shown by the existence of affidavits, warrants of arrest, and other papers in the possession of the deceased.

10. Same—Instruction as to Admissibility of Evidence Showing Motive.—When evidence that shows the accused to have been guilty of other offenses is admitted to show motive, it is proper to instruct the jury as to the purpose for which this evidence is admitted.

L. G. CAMPBELL, ROBT. HARDING, JAMES N. SHARP and D. E. McQUARRY for appellant.

JAMES GARNETT, Attorney General, CHARLES H. MORRIS, Assistant Attorney General, O. H. WADDLE & SON, M. L. JARVIS, Commonwealth's Attorney; MORROW & MORROW, WESLEY & BROWN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Under sentence of death by the judgment of the Pulaski Circuit Court, the appellant prosecutes this appeal, and asks a reversal for errors committed to his prejudice during the trial that resulted in his conviction.

The appellant and Fount Helton were indicted by the grand jury of Pulaski county at a special term of the circuit court held in July, 1911, for the murder of A. J. Beatty, and, when the case was called for trial at this special term, on motion of the defendants, the Commonwealth was required to elect which one of them it would first try, and it elected to try appellant. Thereupon, the appellant filed a motion and grounds for a continuance, and the case was continued until the regular September term of the court, when the trial was had and the judgment entered from which this appeal is prosecuted.

Before taking up the facts of the case and the errors that it is alleged were committed in the admission of evidence and in the instructions given to the jury, we will dispose of the preliminary question raised by counsel, that the motion to quash the indictment should have been sustained because the court had no jurisdiction to call the special term or to empanel a grand jury thereat or receive the indictment against appellant returned by this grand jury.

The order calling the special term at which the indictment was found conformed strictly to the provisions of the statute. It set out that it appearing to the satisfaction of the Judge that the business of the court required it, a special term was called to convene on July 28th, and further gave notice that—

"A grand jury will be empaneled at said special term of said court for the investigation of violations of the criminal and penal laws of the State, and should said grand jury return indictments against James Ellis and Fount Helton, or either of them, upon the charge of shooting and killing A. J. Beatty and W. F. Heath, or either of them, said prosecutions will stand for trial, and motions, orders and judgments may be made and entered in either or both of said cases."

Upon this record it will be conclusively presumed that there was a necessity for calling the special term, and this order gave the court at the special term full jurisdiction to take any action that could be taken at a regular term of the court in reference to the indictment and trial of violators of the penal and criminal laws of the Commonwealth, and, therefore, the court correctly overruled the motion of counsel for appellant to quash the indictment. Banks v. Commonwealth, 145 Ky., 800; Penman v. Commonwealth, 141 Ky., 660.

Another error assigned is that the court disregarded the substantial rights of appellant in discharging four jurors. It arises in this way—at the September term, when the case was called for trial, all the jurors composing the regular panel were excused except four, who were tentatively accepted by both parties but not finally by either. After the regular panel had been exhausted, with this result, the court under the authority conferred by Section 194 of the Criminal Code ordered the sheriff to summon one hundred qualified jurors from the adjoin-

ing county of Lincoln, and after this order was made the Judge on his own motion and over the objection of counsel for appellant, discharged the four Pulaski county jurors that had been conditionally accepted. It is evident that the court was influenced to take this action because he believed a fairer trial could be secured for both the Commonwealth and the accused if all the jurors were selected from an adjoining county; and there is no suggestion in the record that the rights of appellant were in any manner prejudiced by this ruling of the court, to which only a formal objection was made. But if this were not so, we would nevertheless be precluded from reviewing the ruling of the court by Section 281 of the Criminal Code, providing that:

"The decisions of the court upon challenges to the panel, and for cause, or upon motion to set aside an indictment, shall not be subject to exception."

Construing this section of the Code in many cases, we have ruled that error—if there be one—in the manner of obtaining or selecting a panel is not available in this court, as the decision of the trial court on questions relating to the empaneling of jurors is not subject to exception. Howard v. Commonwealth, 118 Ky., 1. It must be admitted that this section and the construction given to it, places great and unrestrained power in the hands of the trial judge in the selection of a jury, but it is not to be assumed that a judge will exercise it in an arbitrary or unjust manner or so abuse his office or discretion as to knowingly or purposely deny either to the Commonwealth or the accused the right to select a jury in the mode pointed out in the Code and statutes. But, however this may be, it is certain that in this case the trial judge did nothing to affect either the rights of appellant or the Commonwealth.

Coming now to the facts of the case, they may be stated as follows: A. J. Beatty was a justice of the peace in the magisterial district of Pulaski county, embracing the town of Burnside, in which the homicide took place, and W. F. Heath was the constable in that district. The appellant, Ellis, was a deputy sheriff of Pulaski county, and his co-defendant, Fount Helton, had been appointed a deputy constable for the district. So that, all of the parties were officers of the law, and the evidence shows that both Esquire Beatty and Constable Heath were vigilant and faithful in the discharge of all

of their official duties, and especially earnest and efficient in their efforts to suppress the unlawful sale of intoxicating liquors in that district. The appellant for some time previous to the homicide had been engaged in operating what is called a "soft drink" establishment, and a number of warrants had been issued against him by Esquire Beatty for violations of the liquor laws. Some of these warrants had been placed in the hands of Fount Helton for execution, and it appears that on the day of the homicide, Helton, acting in the capacity of deputy constable, in company with the appellant, came to Burnside, where Esquire Beatty lived, and had his office, for the purpose of permitting appellant to execute bonds for his appearance to answer at a trial under these warrants. The shooting that resulted in the death of Esquire Beatty and Heath occurred about five o'clock in the afternoon, and appellant and Helton had been in Burnside for several hours previous to that time. Sometime before five o'clock they both became under the influence of liquor, and at some place in the town acted in such a disorderly manner that a citizen at once applied to Esquire Beatty for a warrant for their arrest, of which fact both appellant and Helton had notice before they went to the office of Esquire Beatty, which was in a large room upstairs over a store. When appellant and Helton, both of whom were armed with pistols, and either drinking or drunk, went upstairs to the office, they found there no persons except Esquire Beatty and Heath, both of whom it appears were seated in the room when Helton and appellant went in. It is shown that in addition to the warrants of arrest that Helton had for appellant, Esquire Beatty had prepared and there was on his table several other warrants against appellant for violations of the liquor laws as well as violations of the gaming laws, and also a warrant for his arrest on the charge of disorderly conduct in the town of Burnside that afternoon. Appellant and Helton had only been in the office a few minutes when the shooting commenced, and, as no persons except the four men were present, there is no testimony as to what occurred immediately before the firing began, except the evidence of appellant, as Helton was not introduced as a witness. But there was a brief interval between some of the shots, and before the shooting was entirely over, some persons who were convenient saw a part of what hap-

pened through windows in the room. Without relating further at this place the details of the tragedy, it may be said that when the shooting was over, Heath was found lying dead in the room with five shots in his body and Esquire Beatty so desperately wounded by a like number of shots that he died in a few minutes.

The appellant in his testimony said in substance that when he and Helton went into the room, they found Esquire Beatty and constable Heath both seated at a table, Esquire Beatty being busy writing or handling some papers about his typewriter which sat near him on the table. That he asked Esquire Beatty if he was ready to recognize him on the warrants that had been delivered to Helton for his arrest, and, before Esquire Beatty had time to answer, Heath arose up out of his chair and said, "I have a warrant for you," and immediately drew his pistol, when Helton, who was standing close to him grabbed it and at once the shooting commenced. He admitted that he fired several shots at Heath, but denied that he fired any shots at Esquire Beatty or that any shots fired by him struck Esquire Beatty, and if they did, it was not intentional on his part, as he had no grievance against Esquire Beatty or against Heath, and only shot Heath in self-defense. There being no direct evidence that appellant shot Esquire Beatty, the Commonwealth was obliged to and did make out the case against him by circumstances and facts which demonstrated in a very satisfactory manner that he either shot Esquire Beatty or aided and assisted Helton in shooting him. That one or the other of them shot and killed Esquire Beatty there can be no doubt, and this being so, it is not material which one of them fired the shots that killed him, if the other aided or assisted the one that did the shooting. Beatty, at the time he was killed, was unarmed, and in the act of discharging his official duties and there is no suggestion that he had in any manner threatened or assaulted either appellant or Helton. Although appellant testifies that he had no grievance against either Esquire Beatty or Constable Heath, it is a fact, nevertheless, that a number of warrants had been issued by Esquire Beatty for his arrest and that at the time he was killed he was issuing other warrants for his arrest, and it is also shown that both Esquire Beatty and Constable Heath were determined to suppress the illegal sale of intoxicating liquors, and

that appellant, under the guise of operating a "soft drink" establishment, was engaged persistently in this lawless traffic. So that, notwithstanding his protestations of friendship, it is easy to believe that he entertained for both of them a hostile feeling which was aggravated by his intoxicated condition. And, although it is shown that appellant, in company with Helton, went into the office of Esquire Beatty for the purpose of executing bonds for his appearance, declarations made by him that afternoon shortly before he went to the office, strongly establish that his mind was not filled with peaceful intentions. As illustrative of this, it is in evidence that a few days before the homicide, he said in response to a suggestion that Constable Heath would give him trouble if he attempted to sell whiskey in Burnside; "G—d— him; he can't arrest me; I'll be d— if he does; I am crippled up now and can't run." And Lum Evans testified that just a few minutes before Esquire Beatty was killed a man named Waldon asked him to go and get out a warrant for the arrest of appellant and Helton for disorderly conduct, and that while on his way to see about having a warrant issued or on his return after he had given the necessary information, he met appellant, who said to him: "Did you go after Mr. Heath?" And, in reply he said that Mr. Waldon told him to do it; when appellant said, "Do you know you are going to cause some trouble here in Burnside right away over that." He further testified that the appellant said "He was there to back up what he had done, and stay in Burnside." Mrs. Sallie Spencer testified that between three and four o'clock that afternoon, she saw the appellant and Helton driving in a buggy towards Loyd's store. Asked to tell the jury whether or not she heard appellant say anything on that day, and if so, what it was she heard him say, she answered:

"I was taking some milk and butter and had to pass Loyd's store, and as I passed the buggy I noticed the crippled man in it (that is, Helton), and as I drew near the store I heard talking in the store; a quick voice said, 'I would kill the d—s—o—b——s,' and Ellis said, 'If I make a pass I will fill them both full;' and that was as he came out of the screen door; he liked to have run over me. Q. Where did he go? A. He went to the buggy and got in and they drove back. Q. Do you know whose voice it was that said 'he would kill the s— o—

b——s? A. I don't know. Q. How long after he spoke until Ellis said what he did? A. The man spoke as Ellis opened the screen door and came out, and I stepped up, and Mr. Loyd said 'good evening' in a low tone of voice."

She did not know who the people in the store were talking about, or who remarked that "I would kill the d— s— o— b——s," and it is argued that this evidence was incompetent. It does not appear that any objection was made to the evidence at the time the witness testified, but at the conclusion of the evidence for the Commonwealth, counsel for appellant

"Made a motion to exclude certain testimony of witness York, Solomon, Evans, and made the same motion as to the testimony of Mrs. Sallie Spencer, and the testimony of all the witnesses that stated that they say they saw this defendant Ellis shoot and kill Wm. Heath, because Beatty was killed prior to the time Heath was fired at or killed; which motion was overruled."

It is very clear that if this evidence of the witness was incompetent, no proper or available objection or exception was taken to it, as the motion at the conclusion of the evidence to exclude from the jury "the testimony of Mrs. Sallie Spencer" was not sufficiently definite to call the attention of the court to the particular answers in her evidence that counsel desired to object to. By all the rules of practice with which we are familiar, when objection is made to the whole of the testimony of a witness, without specifying any particular part of it, the motion should be overruled, if any of it is competent. If it is desired to save an exception to incompetent evidence that can be available upon appeal, the exception should point out the particular evidence objected to. Mrs. Spencer testified in relation to several matters other than the declarations of appellant, and although the court might have been of the opinion that her statement as to what appellant said was incompetent, he would yet not have been justified in excluding as requested by the motion the whole of her evidence, because other matters testified to by her were unquestionably competent. With this statement as to the condition of the record, we might well leave without further comment the objection to this evidence, but in view of the grave character of the case, we will consider it more fully for the purpose of showing that th's evidence was competent.

As we understand the rule evidence of a threat, or a general threat to do violence to some person or persons, although the declarant may not mention the name of any person, and the witness may not know what person or persons the threats are directed against or have reference to, is competent as showing malice and ill will either general or personal, when, shortly after the threat is made, the declarant carries the threat out by an attack or assault on the person he is being prosecuted for assaulting. The subsequent assault shows that the declarant in threatening to do violence had malice and ill will towards everybody or towards some particular person, and, evidence of the threat is competent to show general malice and ill will and a general desire to commit violence, or malice and ill will towards the person who is the subject of the assault. In this case, that the threat was directed at Esquire Beatty and Constable Heath, can not be doubted, when considered in connection with the murderous assault shortly afterwards made upon them. The question of the competency of evidence like this was before the court in Sparks v. Commonwealth, 89 Ky., 644. In that case, the court said:

"The first error we will notice is the refusal of the court to permit a declaration of the deceased, made a short time before he advanced towards the store house of appellants, to go to the jury. That declaration, accompanied with an oath, was that he was going to take Lilly (the name of the town where the difficulty occurred). Clearly, the court erred in excluding this declaration from the jury; for while the threat was not, in terms, directed at appellants, there can be no doubt that he meant and referred to appellants, or at least to Sparks, who were then in their store house, which was closed to prevent the deceased from entering."

In Brooks v. Commonwealth, 100 Ky., 194, it appears from the opinion, that—

"Over the objection of the appellant, testimony was admitted by the trial court in behalf of the Commonwealth of general threats made by the appellant on the day and a short time before the difficulty in which the killing occurred, and the object of this testimony was to establish malice. Henry Ross testified that about a half hour before the killing the appellant came to the store where he was clerking, and that he asked him if he wanted anything, and that his answer was: 'Yes; he wanted some damned man to jump on him, so that he

could kill him. He had tried Jess Blair and James Blair, and they would not stand in.' Coon Ross testified that from twenty to thirty minutes before the killing the appellant came to where he was, about one hundred yards from the place where the killing occurred, and said he would 'blow some damned man's lamp out.' Dan Caskey testified that a half hour or an hour before the killing, the appellant came where he was, with James Blair, and said: 'Boys, stay in town tonight; I am going to kill some damned man.' "

The court held this evidence admissible:

"In order to establish 'general malice and purpose to injure or kill some one,' of which the deceased became the victim."

In Whittaker v. Commonwealth, 13 Ky. Law Rep., 504, the Commonwealth proved that Whittaker during the day the homicide occurred made threats that he intended to kill some one. In speaking of this evidence, the court said:

"The threats were general; no intended victim was named; but the accused, in profane language, declared his purpose to kill a man upon that day. In making these threats he usually exhibited or referred to his knife or pistol. * * * The evidence of these threats and this conduct was not competent as a part of the subsequent res gestae; they were not a part of the bloody transaction; but it was competent as showing general malice and a purpose to injure or kill some one; and the deceased became the victim." To the same effect is Young v. Commonwealth, 19 Ky. Law Rep., 929; Hopkins v. Commonwealth, 50 Pa. St., 9, 88 Am. Dec., 518; Hodge v. State, 26 Fla., 11.

Joe Lewis, Marshal of Burnside, testified that when he heard the firing, he went towards the office of Esquire Beatty and when he got there appellant and Helton were walking out of the room, each with a pistol in his hand, that after appellant came out of the building, appellant remarked "We surrender; we done what we had to do," and I said "What have you done?" and he said "We have killed Esquire Beatty and Bill Heath," as I remember. He further testified that while they were walking up the street, appellant said that "him and Helton, or rather that Helton, reached the papers out to the Esquire, and said "Here are the warrants and bonds in these cases" and after he took them into his hand he said "That is all;" he then said Bill Heath spoke up and

said 'that is not all for me, Jim; I have papers for you;' and he said Mr. Heath went to his pocket where he had his gun and jerked it out, and he struck at it and the gun fired, and he said 'I thought I was shot and I jerked my gun and went to shooting to save my own life.' Q. Was that all he said? A. Helton rung in then. Q. Did Helton make a statement to you and in the presence of Ellis then and there? A. After this statement had been made by Ellis, Helton said "Esquire Beatty run in and grabbed around me and hugged around me and I don't know what took place." To this last question and answer objection was made and overruled, and it is earnestly insisted that this evidence of Lewis relating what Helton said was incompetent and prejudicial, as appellant did not assent or agree to what Helton said and should not be bound by it. Merriwether v. Commonwealth, 118 Ky., 870. It is quite difficult to understand in what respect this statement of Helton's was prejudicial to appellant, as it did not in any manner or form implicate appellant in the shooting of Esquire Beatty; nor did it contradict appellant's version of what occurred, as will be seen by the following extracts from his testimony:

"Q. What became of Beatty and yourself while that was going on? A. I got against the side of the house and Beatty was behind me. Q. Did you stay there— how long—or, what was said or done by you or Esquire Beatty? A. I was trying to get back out of the way, and Heath was trying to get the pistol loose, and Helton was shooting, and Heath was knocking it off; and it fired back where we was, and the smoke blinded us, and then Beatty hollered. Q. What did he say? A. He said he was killed. Q. After Beatty hollered that he was killed, did you feel him? A. He run around me, and run right into them. Q. What occurred after Beatty fell in there on these people? A. After he run among them, he came down on Fount's arm, and broke his hand loose from the pistol, and then Heath turned it on me, and then I went to shooting."

In his cross-examination he said this: "Q. When Beatty hollered, did he fall? A. No, sir. Q. What did he do? A. He run around from behind me and got into them. Q. He run ahead of you and passed around the table and got to where Heath and Helton was? A. No, sir. Q. How did he get to them? A. He was right here, and they were here scuffling over the corner of the table,

and Beatty run around here and got in here and Helton's arm was up and he broke it loose from Heath's pistol. Q. He broke Helton's hand loose from Heath's pistol, and you say Heath turned it towards you? A. He did. Q. You heard Beatty hollering 'I am killed' and he run in and grabbed Helton's arm, Beatty was on the left side of Helton and he left you and you commenced shooting at Heath? A. Yes, sir. Q. With Helton and Beatty between you and Heath? A. Yes, sir. Q. And you fired four shots? A. Yes, sir, I did.''

From this, it will be observed that appellant not only fully corroborated the statement that Helton made, but related in detail the manner in which Esquire Beatty run in and ''grabbed'' or ''hugged'' Helton.

In view of this evidence of appellant, it is clear that the statement of Helton was not at all prejudicial, as a party can not well be prejudiced by the statement of another person that he adopts and makes a part of his own testimony.

Another insistance of counsel is that a new trial should have been granted upon the ground of newly discovered evidence. In the motion of a new trial it is set out as one of the grounds that:

''The defendant has discovered important evidence in his favor since the verdict, to wit: That of Mrs. Mat Loyd, John Cox, Laura Coomer and Agnes Coomer, as follows: That the said witnesses will testify, and the same will be true when proven, that at the time the defendants, James Ellis and Fount Helton were at the store of Mat Loyd, Mrs. Spencer was at the home of Laura Coomer and Agnes Coomer, at least one hundred yards from the store of Mat Loyd, and did not hear and could not have heard James Ellis say that 'if I bring it up, I will fill them full' or any words whatever; that Mrs. Mat Loyd and Laura Hughes will state that neither James Ellis nor Fount Helton made any statement at Loyd's store about Esquire Beatty or William Heath, or either of them, and that neither of them made any statement or statements as testified to by the said Sallie Spencer; and, that the statements of Sallie Spencer were untrue in whole.''

In support of this ground, there is filed the affidavits of Mrs. Loyd, Laura Hughes, John Cox, Laura Coomer and Agnes Coomer; but there is no affidavit of appellant that he did not discover and could not by the exercise of reasonable diligence have discovered these witnesses

and what they would testify to before the trial was concluded. Excepting the unsupported statement in the ground for a new trial that "the defendant has discovered important evidence in his favor since the verdict," the record does not show when this evidence was discovered. Section 271 of the Criminal Code provides that:

"The court in which a trial is had upon an issue of fact may grant a new trial, if a verdict be rendered against the defendant by which his substantial rights have been prejudiced, upon his motion, in the following cases. * * * (6) If the defendant have discovered important evidence in his favor since the verdict."

Previous to the amendment of section 281 of the Criminal Code by the act of March 23, 1910, the action of the lower court in overruling a motion for a new trial could not be reviewed by this court on appeal; and so if a new trial was asked on the ground of newly discovered evidence, and the lower court declined to grant a new trial, the matter would be finally ended. But now we have the power to review the action of the lower court in overruling a motion for a new trial, if it appears that the court erroneously refused to grant a new trial. And so, if one of the grounds for a new trial is newly discovered evidence, and the motion is overruled in the lower court, we will consider the grounds relied on and grant or refuse a new trial as seems right and proper. Wilson v. Commonwealth, 140 Ky., 1. But the practice as to granting new trials for newly discovered evidence is the same in criminal as in civil cases. Hayes v. Commonwealth, 140 Ky., 184. And it is the settled and well known practice in civil cases that a new trial will not be granted on the ground of newly discovered evidence unless the party asking a new trial in addition to the other requisites files his affidavit setting out that he did not know and by the exercise of reasonable diligence could not have known of the existence of the newly discovered evidence until after the trial had concluded. Bronson v. Green, 2 Duvall, 234. The reason for this rule is obvious. Except for it, a party might not make any effort to obtain the presence or testimony of absent witnesses until after there had been an adverse judgment against him. If a new trial should be granted upon the ground of newly discovered evidence, upon the mere statement in the motion and grounds for a new trial that the evidence was not discovered until after the verdict it would

encourage defendants to be indifferent and careless in the preparation of their case, would greatly obstruct and embarrass the administration of the criminal law, and afford wide opportunity to obtain new trials when by the exercise of reasonable diligence the newly-discovered evidence could have been procured on the trial. So that, the defendant asking a new trial on this ground must affirmatively show by his own affidavit that the evidence was unknown to him and his counsel engaged in the trial, and could not have been discovered by him during the trial. Nor will a new trial be granted in any state of case where the newly-discovered evidence is merely cumulative or unless it be "of such a permanent and unerring character as to preponderate greatly or have decisive influence upon the evidence to be overturned by it; and especially does this rule obtain with respect to parol testimony." It is a further rule of practice that a new trial will not be granted except in rare cases on account of newly-discovered evidence, which only tends to discredit or impeach an opposing witness. Price v. Thompson, 84 Ky., 219; L. & N. R. Co. v. Ueltchi's Admr., 126 Ky., 556; Hayes v. Commonwealth, 140 Ky., 184. We may further add that if the practice we have outlined had been observed the discovered evidence was not sufficient to justify us in ruling that the appellant was entitled to a new trial, first, because the evidence of Mrs. Spencer was merely cumulative, and second, because the only effect of the newly-discovered evidence was to discredit or impeach her testimony and this evidence was not of such controlling importance as to warrant a departure from the rule that a new trial will not generally be granted to discredit or impeach a witness. Some technical and unsubstantial errors in the instructions are pointed out by counsel for appellant, but upon the whole we think they fairly and correctly submitted the issues involved to the jury.

The first instruction told the jury in substance that if appellant not in defense of himself or Helton shot and killed Esquire Beatty, or, that Helton not in his defense or in the defense of appellant killed him, and that appellant was present advising and assisting Helton in killing him, or, if they believe that appellant not in his self-defense or in defense of Helton shot at Constable Heath and killed Esquire Beatty, or, that Helton not in defense of himself or appellant shot at Constable Heath with the

intention of killing him and killed Esquire Beatty, and was advised so to do by appellant, they should find appellant guilty of murder if he acted maliciously in shooting and killing Esquire Beatty or in aiding and assisting Helton to do so, and guilty of voluntary manslaughter if he shot Esquire Beatty or aided or assisted Helton in shooting him in sudden heat and passion and without previous malice.

In another instruction they were told that although they believed from the evidence that appellant shot and killed Esquire Beatty, or aided and assisted Helton in shooting and killing him, they should acquit him if he had reasonable grounds to believe that he or Helton was in danger of serious harm at the hands of Esquire Beatty, and that it was necessary or believed by appellant in the exercise of a reasonable judgment to be necessary to shoot and kill Esquire Beatty or to aid or assist Helton in so doing.

In another they were told that although they might believe from the evidence that appellant shot at Constable Heath with the intent to kill him, and in so doing the shot took effect in the body of Esquire Beatty, killing him, or, that Helton fired at Constable Heath with the intent to kill him and the shot so fired killed Esquire Beatty, and that appellant aided and assisted Helton in so shooting at Heath, yet, if they further believed that at the time appellant believed and had reasonable grounds to believe that he or Helton were in danger of bodily harm at the hands of Constable Heath, and that it was necessary or believed by appellant in the exercise of a reasonable judgment to be necessary to aid and assist Helton in shooting Constable Heath in order to avert the danger, they should acquit him.

In another instruction they were told that:

"You are to take and receive the affidavit of Waldon and the warrants read to you by the witness, R. H. Waddle, which were issued against defendant, Ellis, by deceased, Beatty, as a justice of the peace, as evidence for the purpose only and in so far only as in your judgment may tend to show a motive for the acts and conduct of the parties to the difficulty, in which A. J. Beatty and W. F. Heath were killed, if in your judgment they do show or tend to show motive. The word 'motive,' as used in these instructions by the court means inducement, reason, cause or incentive to do the acts and things charged

in the indictment herein, if they or any of them were done.''

On the trial, it was shown that the affidavit of Waldon, and the warrants issued by Esquire Beatty against appellant were lying on the table of Esquire Beatty at the time he was killed—some of them being in a state of preparation, and it was competent for the Commonwealth to prove the existence of this affidavit and these warrants for the purpose of showing that their preparation and issual was the motive, or one of the motives, that prompted appellant in his murderous assault upon Esquire Beatty and Constable Heath. Martin v. Commonwealth, 93 Ky., 189; Wendling v. Commonwealth, 143 Ky., 587; O'Brien v. Commonwealth, 115 Ky., 608. When this evidence was admitted, it was proper to give the instruction to advise the jury of the only purpose for which this evidence was admitted.

We have given to this record a most careful consideration, and our conclusion upon the whole case is that the appellant had a fair trial and the judgment is affirmed.