## Chaney v. Commonwealth.

(Decided September 25, 1912.)

## Appeal from Woodford Circuit Court.

1. Criminal Law—Application for Change of Venue—Discretion of Trial Courts.—The exercise of the discretion by the trial court in refusing a change of venue will not be reversed unless it appears from the record that this discretion has been abused.

2. Criminal Law—Continuance—Discretion of Trial Court in Refusing.—Where no facts were shown to sustain the statement of the affidavit for a continuance that the proper effect of the testimony of the absent witnesses could not be had without their personal presence, it cannot be said that the court abused a sound discretion in refusing to grant the continuance.

3. Criminal Law—Separation of Jury During Trial.—Where the offense upon which accused was being tried was not a capital offense, it was within the discretion of the trial court to permit the jury to separate during the trial.

4. Criminal Law—Formation of Jury—Action of Trial Court Is Not Subject of Review.—The action of the trial court in accepting as jurors those who had formed or expressed an opinion, even had it been set out in the bill of exceptions, as it is not, is not subject to review.

5. Criminal Law—Credibility of Witnesses.—The credibility of the witness is for the jury, and this court will not disturb a verdict because the jury believed one set of witnesses rather than another. The verdict must be palpably against the evidence or it cannot be disturbed.

6. Criminal Law—Carnally Knowing Female Under Age of Sixteen—Testimony of Misconduct with Others by Prosecutrix—Evidence to Sustain Conviction.—Upon the trial of appellant on the charge of carnally knowing a female under the age of sixteen years, the trial court properly limited the testimony as to the misconduct of the prosecutrix with others to its evidential effect upon the question of her veracity. There is no error of law in the record, and the testimony by the prosecutrix is such as to sustain a conviction.

JAMES H. MINOGUE, R. S. CRAWFORD for appellant.

JAMES GARNETT, Attorney General, D. O. MYATT, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE WINN—Affirming.

George W. Chaney was indicted in the Woodford Circuit Court, charged with the offense denounced by section 1115 of the Kentucky Statutes, that of carnally

knowing a female under the age of sixteen years. Upon a trial he was found guilty and thereupon given the statutory indeterminate sentence of from ten to twenty years in the penitentiary. The supposed errors complained of can be disposed of briefly.

It is first complained that the court erred in refusing to grant a change of venue upon the defendant's application. The application came on for hearing in due course and the trial judge overruled the motion. It has been repeatedly declared by this court that the exercise of the discretion given the trial court will not be reversed unless it appears from the record that this discretion has been abused; and no abuse appears here. Crockett v. Commonwealth, 100 Ky., 382; Greer v. Commonwealth, 111 Ky., 93; McElwain v. Commonwealth, 146 Ky., 104, and many other cases.

Upon the calling of the case for trial, the defendant asked for a continuance, based upon his affidavit of the testimony of two absent witnesses, to obtain whose presence due diligence was shown. The trial was not had at the first term after the indictment was found, and the affidavit of what the witnesses would testify was read as their depositions, as is provided in section 189 of the Criminal Code. The affidavit stated that the just and proper effect of the testimony of these absent witnesses could not be obtained without their personal presence before the jury; but no facts were shown to sustain this statement. In the absence of such a showing we cannot say that the court abused the sound discretion given it by the section named. Bowling v. Commonwealth, 148 Ky., 9.

It is next objected that the jury was permitted to separate during the trial; but the offense was not a capital offense, and it was within the discretion of the trial court to permit them to separate. Criminal Code, section 244.

It is next urged that the court erred in the formation of the jury in accepting as jurors those who had formed and expressed an opinion as to the guilt or innocence of the accused. This action of the trial court, even if it were set out in the bill of exceptions, as it is not, is not subject to review by us. Miracle v. Commonwealth, 148 Ky., 453, and many other cases.

It is next urged that the defendant's motion for a peremptory instruction should have been sustained, be-

cause the testimony of the prosecutrix as to her age was uncorroborated.   This position is not sound because, though the girl participated in the act, she was not an accomplice in the crime  denounced  by  the  statute. While strictly speaking, one cannot know his own age except upon hearsay information, the courts have commonly preferred to accept as testimony the practical certainty, based upon one's information as to his age, rather than to insist on academic nicety.   Wigmore's Evidence, section 667.   In prosecutions similar to this, the testimony of the prosecutrix as to her age has been admitted in State v. McLain, 49 Kan., 730; Commonwealth v. Phillips, 162 Mass., 504; State v. Bowser, 21 Mont., 133, and other cases.

Much is justly made in the brief of the appellant of the improbable character of the testimony upon which Chaney was convicted.  It was formerly held that this court, where there was any evidence to sustain the conviction, was without power to reverse a judgment of conviction  in a criminal case upon the absence of sufficient evidence, if there were any evidence.   Pinkston v. Commonwealth, 127 S. W., 493, and cases cited.    Section 281  of the Criminal Code was so amended in 1910 as that the court has now such right of reversal; but in construing the amended section, we said: "The credibility of the witness is for the jury, and this court will not disturb a verdict because the jury believed one set of witnesses rather than another.   The verdict must be palpably against the evidence or it cannot be disturbed."   Wilson v. Commonwealth, 140 Ky., 1.  We now digest and sum up the testimony upon which Chaney's conviction was had.

George W. Chaney, on the first of  January, 1910, went to work at the Cleveland  Orphan Home in Versailles.  He resided in a dwelling house on the grounds of this institution, adjacent to the main building.  He was  general chore man about the institution.  He was a married man with a family, and at the time of the facts testified to was some fifty-eight years of age. He had lived in Woodford County some fifteen or sixteen years.   He  testified  that he had never been in any trouble before.   C. M. Browning testified that he  had known Chaney twenty-eight years and had never heard his reputation questioned.  G. W. Beck testified that he

had known Chaney three years and that so far as he knew his reputation was good. James W. Miller, a trustee of the orphan institution, said that he knew Chaney as a mechanic at the elevator at which the witness was hauling wheat; that he, the witness, made inquiry among the people where Chaney worked, and acting on the information received, got the trustees to give him the place at the institution; that if he had thought Chaney's character was not good, he would not have been employed. Hunter Brother testified that he had known Chaney four or five or six years; that he had never heard anything against him; that he based his opinion of Chaney's good character upon the character of his personal dealings with him, and that his opinion was made up upon these dealings.

When Chaney went to work at the institution, one of the orphans dwelling there was the prosecutrix, Sarah Jane Wilson. According to her testimony, she was born on the 6th of June, 1896, and at the time of the occurrence of the act detailed by her was some three weeks short of fifteen years of age. Mrs. Annie Wilson, one of the teachers at the home, testified upon cross-examination that Sarah Jane's word "couldn't be depended on." Francis Shryock, one of the girls in the institution, testified upon cross-examination that she knew Sarah Jane's reputation for truth and veracity and that she believed it to be bad. Miss Nell Otter, the superintendent of the home, testified on cross-examination that she did not consider Sarah Jane's reputation for truth very good; that she supposed that she would believe Sarah Jane if she were sworn solemnly to tell the truth and understood what she was doing; but that she thought that Sarah Jane might swear to something she did not fully understand.

So much for the parties. Sarah Jane testified that at six o'clock in the evening on the 16th of May, 1911, Chaney called to her to come to him, that he had some message for her from his daughter; that she went to him; that he unfastened her clothes, laid her down upon the grass, and had intercourse with her; that they had no conversation at the time; that he continued to have intercourse with her about once or twice a week until July 3rd; that before the occurrence of this act he had given her candy, fruit and tolu, and continued to up until the matter became public on the 3rd of July; that

when the matter became public, Chaney asked her to go to Montana with him, and she responded that she did not want to, as the home was the only home she had; that he asked her what was the matter with her, and wanted to know if she had been punished; that she answered that she had not been punished, but that he was the cause; that he said he had not done anything, and she said that he had; that he told her in May that if she ever told about the occurrence he was going to leave the city. On cross-examination, she testified that a boy in the neighborhood, some twelve or thirteen years of age, used to come to the institution after dark and whistle for different ones of the girls; that in March or April, in answer to such a whistle, she had gone out to meet, but that she did nothing wrong with the boy; that she never had intercourse with anybody prior to the 16th of May; that at the time of the occurrence on the 16th day of May, it was not dark; that Mr. Chaney's wife and daughter were at home; that she could see them, and that she believed they were sewing; that within full view of his wife and daughter, Chaney had intercourse with her, and that she, the witness, was looking at the wife and daughter all the time; that the matter became public because Frances Shryock, above named, one of the girls living at the home, had noticed how large the witness was getting, and on the 3rd of July asked the witness about it, and that she, the witness, told her about Mr. Chaney; that she, the witness, did not bear a child. The witness does not make clear as to whether her enlarged personal appearance between the 16th day of May and the 3rd of July was supposed to be due to a condition of pregnancy or to her natural physiological maturity resulting in that period of time from her indulgence in the sexual acts, nor is there explanation of why either cause would have manifested itself within the six or seven weeks intervening between her first sexual act and the time when her increased size was observed by her companion. She further testified on cross-examination that she was punished frequently at the home for staying out at night in the yard and for telling little lies. She denied all the acts of sexual misconduct with others testified to by witnesses for the defense (post). Dr. McCauley testified in substance for the Commonwealth that he had examined Sarah Jane; that her hymen was ruptured, and

that the condition of her vagina indicated that it might have been produced by her first having carnal knowledge of a man on the 16th of May and frequent intercourse thereafter until the examination of her in July. Miss Otter, the superintendent, testified that in April or May she found that Chaney was giving Sarah Jane presents of candy and fruit; that the witness told Chaney that she did not want him to do so any more, because she supplied the children with all necessary food that she wanted them to have; that she thought his own family needed the money and that he had better spend it on them; that he responded that he felt sorry for the motherless children, and asked permission to give them candy on their birthdays. Frances Shryock testified that she had frequently seen Chaney giving Sarah Jane fruit and candy; that she went down to the barn on the 3rd of July, and that Sarah Jane there told her that Mr. Chaney had mistreated her; that while they were there, Chaney came to the door and Jane was crying; that when she, the witness, was ready to come out, Chaney put his arms up to the door, and that when she, the witness, would try to get out he would lean from one side to the other; that she, the witness, picked up a stick with some nails in it, when Chaney's hat blew off, and that when he went to get it she, the witness, went out, and went to the house and told Mrs. Wilson of the occurrence. Susie Brock, a fourteen-year-old child at the home, testified that on the 3rd of July, while Chaney was watering some tomatoes in the garden, Sarah Jane came outside; that Chaney asked her what was the matter, and whether she were mad because she had been punished by the teacher; and that he remarked, "Well, I don't know what's the matter;" that Sarah Jane was rather sighing or whimpering. For the Commonwealth, it further appeared that on the morning of the 4th of July, Chaney obtained permission of the superintendent to go to Frankfort for the day; that he left Versailles that morning on the trolley, went thence to Frankfort, thence on the noon C. & O. train of the same day to Lexington, and thence in the afternoon to Cincinnati, where he stayed a few days; that learning that the officers were after him, he left there and went to Montana, from which place he was brought back upon a requisition to answer this charge; that his

son, who was living in Montana, had there cut off the mustache of the witness.

Upon the other side, Chaney denied in toto that he had ever at any time had intercourse with the girl. He denied the conversation testified to by Susie Brock. He denied the occurrence at the barn to which the Shryock girl testified. He said that he, on the afternoon of the 3rd of July, heard Sarah Jane Wilson talking to two or three other girls in the laundry about sticking it to old man Chaney; that that night, when he went to lock up the main building, some girl or woman whispered down a stairway to him that the girls were fixing to get him into trouble and had already done it; that he had better leave at once that night; that the voice sounded like that of a young person, but that he could not see who the person was; that he went over to the house, and Miss Otter, who had been absent during the day, had not come back; and the next day, and without communicating his troubles to any of those in charge of the home, he had asked permission to go to Frankfort for the day, and had gone on to Montana; that he knew at the time that Sarah Jane's reputation for truth and veracity was bad. He said that when the charge was lodged against him, his mind was torn all to pieces, and that he went to Montana because his daughter and son-in-law there were the only persons he knew who had the money to defend him or to hire any defense or to go on his bond.

Stella Hunter, a stepdaughter of the defendant, testified that along in the first of May she had seen Sarah Jane having intercourse some five times or more with a small man who did not look like he was over twenty-one years of age; that she did not know whether it was the same neighborhood boy that Sarah Jane had gone out to meet; that she knew this boy and had heard from the other girls that he was over sixteen; that the misconduct which she had seen between Sarah Jane and the man was over in a coal yard, on a pile of planks, adjacent to the Chaney residence; that she told her mother and stepfather of the occurrence; and that this was before the 16th of May; that these occurrences were between half-past six and seven o'clock in the evening. Ollie Lee Palmer testified that he removed from Versailles to Cincinnati about the 22nd of May of that year; that a few nights before his removal he spent

the night at Mr. Chaney's house. It rather seems that he was attentive to Miss Hunter, Mr. Chaney's step-daughter. He testified that after he went away he corresponded with her; that when Chaney came to Cincinnati he, Chaney, stayed at the house of the witness. The witness seems to have helped with the coming of the Chaney family to Cincinnati and the like. He testifies, however, that Chaney never told him about the accusation against him until after he returned from Montana; that officers came out to the house looking for Chaney, but that he had gone. Palmer said that on the night he spent at the home of Chaney in Versailles, shortly prior to the 22nd of May, he was compelled to go to the toilet about dusk; that while there, he heard talking, and kept still for a little while; that he crept to look to see what was going on and saw Sarah Jane having intercourse with a boy; that he could not tell who the boy was; that this happened near the hedge fence line between the coal yard and the premises of the orphan home; that after it was over, Sarah Jane came through a little hole in the fence; that he, the witness, greeted Jane, and that she answered; that he asked her, "Who was that guy with you?" that she would not tell; that she said they were going to get married if they could ever get a chance; that he talked to her a little while; that she begged him not to tell of the occurrence, and that he told her it was nothing to him, that he had no right to tell it; and that he did not tell it.

The only remaining testimony is that of the two absent witnesses set up in the affidavit for a continuance, remarked supra. The affidavit set up that one of these witnesses had been often at the home along with Sarah Jane, and that this witness would prove that Sarah Jane was unruly and that her reputation for truth and veracity was bad. The other absent witness was one Elza Chaney. The affidavit set out that she would testify that during the month of May, 1911, she was a visitor at the home of George W. Chaney; that she saw Sarah Jane frequently and frequently talked with her; that she saw her much in company with a young man about twenty years of age; that she saw Sarah Jane on various occasions go into the coal yard with this man and have sexual intercourse with him; that she, witness, remonstrated with Sarah Jane and told her that

she would get into trouble; that Sarah Jane responded that the man was her sweetheart, that he said it was all right, that they were going to be married, that it did not make any difference so long as she was true to the man, that no other man had had anything to do with her, and that they were going to get married in August; that Sarah Jane asked the witness not to tell, and that believing from their actions that they were engaged, she, the witness, had said nothing about it.

The trial court properly limited the foregoing testimony as to the misconduct by Sarah Jane with others to its evidential effect upon the question of her veracity.

As said in the beginning, we find no error of law in the record. The foregoing digest of the testimony discloses that there was ample testimony by Sarah Jane to sustain the conviction. Unfortunately for Chaney, we are limited to the consideration of whether the verdict be palpably against the evidence. We are not permitted to consider the credibility of the witnesses; for, as said in the Wilson case, supra, that is for the jury. We are but reviewers, not triers; and when a jury sends one of its fellow citizens to the penitentiary upon incredible testimony, the convict must look for relief to those who, under the laws of our land, have the right to grant relief—a province which the court has no right to invade, a function which it has no right to usurp. Sarah Jane's reputation for veracity is successfully assaulted by evidence of her general reputation, and by her own admissions. We cannot blind our eyes to the unhappy fact that some children, of both sexes, are morally unbalanced from infancy, the deficiency sometimes manifesting itself in dishonesty, sometimes in sexual perversion, sometimes in habitual lying, sometimes in the one form or another of moral obliquity. This child habitually did not tell the truth. Whether she was guilty of the other moral delinquencies ascribed to her we do not know. We unwillingly affirm the conviction of this sixty-year-old man on her testimony; but the power of pardon is not ours.

The judgment of the trial court is affirmed.