## Sizemore v. Commonwealth.

(Decided September 21, 1920.)

## Appeal from Laurel Circuit Court.

1. Criminal Law—Clothing of Deceased—View of by Jury—Discretion—Evidence.—In the trial of one accused of a felonious homicide, and where the clothing which was worn by the deceased at the time of the reception by him of the mortal wounds has been properly received in evidence, a permission to the jury to take the clothing with it, when it retires for deliberation, is a matter within the discretion of the trial court, and it is not error to grant such permission, unless there is something in the circumstances of the case to show that the permission was an abuse of discretion.

2. Criminal Law—Impeachment of Juror.—The evidence of a juror can not be received upon a motion for a new trial, to impeach the verdict of the jury, or to prove his own misconduct as a juror, or that of his fellows.

3. Criminal Law—Continuance.—A party, who is surprised by the testimony of a witness must before the conclusion of the trial, move the court for a continuance or postponement of the trial to enable him to counteract the effect of the testimony of the witness, showing his grounds therefor and ability to do same, as it is too late to do so, on a motion for a new trial.

4. Criminal Law—New Trial.—A new trial will not be granted on account of newly discovered evidence, which is merely cumulative, or can be used only to impeach a witness, who has testified upon the trial, unless the new evidence is of such a permanent and

convincing character as to be reasonably calculated to change the result upon another trial.

JAMES D. BLACK, J. K. LEWIS and B. F. JOHNSON for appellant.

CHARLES I. DAWSON, Attorney General, and W. P. HUGHES for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

The appellant, Jeff Sizemore, was indicted for the crime of murder and upon trial, was found guilty of voluntary manslaughter and his penalty fixed at imprisonment for the period of twenty-one years, by the verdict of the jury. His motion to set aside the verdict and to grant him a new trial was overruled, and judgment rendered in accordance with the verdict, and from the judgment he has appealed.

The chief facts constituting and connected with the crime of which the appellant was adjudged guilty are as follows: No actual trouble or cause of animosity had occurred or existed between him and the victim, but, some trivial cause of animosity was supposed to have existed between the accused and a son-in-law, of the same name, who was a brother-in-law of Joseph Hibbard, the victim of the crime. According to the evidence given by Napier, another son-in-law of the accused, a few days before the homicide, Hibbard had threatened to give the accused some personal chastisement and had requested Napier to convey the threat to the accused, but, Napier had failed to comply with the request of deceased. According to the uncorroborated statements of the accused, about a week preceding the tragedy, he was at his barn, near a road, along which the deceased was traveling, and when the deceased saw the accused, he thrust his hand in his pocket and applied an opprobrious epithet to him. The accused went into his barn and the deceased passed on, and a few days preceding the homicide the deceased crossed over the fences and premises of the accused, in the neighborhood of the latter's dwelling, with a gun upon his shoulder, and as the accused thought, in a menacing and threatening manner. Some days preceding the tragedy, the accused visited the judge of the county court, as he says, with the intention of procuring a warrant to issue against his son-in-law, Sizemore, and the deceased, for the purpose of requiring them to give sureties to keep the peace, but, the judge was of the opinion,

that the issual of a warrant would not remedy the trouble and so advised the accused, promising to give assistance in some other way, and a warrant was not issued. Thereafter, upon a morning, about eight o'clock, the accused was at a small crib, which stood about twelve or fifteen feet from the road, and wherein he stored corn and fodder, when the deceased passed along the road upon foot. The direction in which the deceased was going, placed his left side toward the crib, which had a door, which opened in the direction of the road, and just as deceased arrived at a point in the road, opposite to the crib, the accused fired upon him with one barrel of a double barreled shot gun, and directly thereafter discharged the other barrel at him. Directly, thereafter, the accused came from the direction of the crib with a shot gun in his hands, and approaching his son-in-law, Napier, who was in the road, near to the dwelling of the accused, requested him to convey word to his son-in-law, Sizemore, to come and remove the body of Hibbard, and at the same time, remarking that "he (Hibbard) would quit patting his pistol," or "fellows would learn to quit patting their pistols." A few minutes before the shots were heard the deceased was seen in the road about sixty to seventy-five yards from the crib, walking in the road in that direction, but, no one saw him at the time of the shooting, except the accused; but, John Watkins, who was four hundred yards away saw the smoke from the first shot and saw the accused at the time, he fired the second shot. Just opposite the door of the crib there was blood upon the ground, and fifteen to twenty feet further along the road lay the hat of deceased, perforated by a bullet hole. A few steps further on and in the direction he was going, and on the opposite side of the road from the crib, the dead body of the deceased was lying upon its face. Quite a number of buck shots had penetrated the left side of the body, and one the left side of the head, corresponding to the bullet hole in the hat. Two wounds were in the front of the abdomen, below the navel and from appearances, the deceased may have been standing with his front to the accused at the time the shots were fired, which made the two wounds. Another wound was in the right corner of the right eye. A pistol was found in the right coat pocket of deceased and was lying with its top down. The accused claimed, that he was at his crib and engaged in shucking corn in front of the door and just against the doorstep, with his shot gun, by his side, which he had with him, out of fear of violence at

the hands of his son-in-law from whom he was estranged, and the deceased, and that when the deceased arrived opposite to the crib, he thrust his hand into his coat pocket, applied a foul name accompanied by an oath to the accused, and that he (accused) fearing for his safety, immediately fired upon the deceased, who fell to the ground upon his left hand, but, at the same time was attempting to draw his pistol from his right coat pocket, when he discharged the other barrel of his gun at him. Pieces of paper apparently used as wadding in the loading of a gun were scattered between the crib and the point in the road, where the blood spots were upon the ground. The point in the road where the blood was and where the body lay, was fifty or sixty feet from the crib.

No criticism is made of the instructions given to the jury, nor of any rulings of the court upon the admissibility of evidence heard or offered, and it is not questioned but what the evidence was amply sufficient to justify and support the verdict of the jury.

A. (1) A ground urged for a reversal of the judgment is, that the court, over the objection of the accused, permitted the jury to take to its room, when it retired to consult of its verdict, the clothing, which the deceased was wearing at the time, he was slain; and (2) that in the room, where no one was present except the members of the jury, and while they were consulting as to its verdict, the coat of deceased was placed upon one of the jurors, and from the bullet holes in it, with relation to the body of the juror, it arrived at the conclusion, that the wounds upon the front of the person of deceased were caused by bullets which passed through his body from the left side, and were not discharged at him from in front of him, and the jury thus received and considered evidence out of the presence of the accused. These objections to the fairness of the trial are, however, found to be unavailing. Section 248, Criminal Code provides: "Upon retiring for deliberation, the jury may take with them all papers and other things, which have been received as evidence in the cause." This statute has been construed as vesting in the sound discretion of the trial court, the right to determine whether papers or other things, which have been received in evidence upon the trial, should be permitted to be taken by the jury upon retiring for deliberation. The clothing, which deceased was wearing at the time, he was shot and thereby killed, after it had been proven that it was in the same condition, as it was, when the lifeless body was found, immed-

iately following the receipt of the mortal wounds, was properly admitted in the evidence, to throw any light which it might upon the cause and manner of the death. McCandless v. Com., 170 Ky. 308. There is no suggestion or intimation that there was any change of the condition of the clothing in any way, from the condition it was in immediately following the homicide. It is not possible to see how, the permission of the jury to take it to its rooms, when retiring for deliberation was an abuse of discretion on the part of the court. Taylor v. Com., 92 S. W. 292; Carney v. Com., 181 Ky. 43.

A (2) The alleged reception by the jury of evidence, out of the presence of the accused, by the use made of the clothing of deceased, is attempted to be shown upon the motion for a new trial by the affidavit of one of the jurors. It is a very old rule, in the administration of justice, in this jursidiction, that the evidence of a juror cannot be received to impeach the verdict of the jury, or to prove the misconduct of himself or of his fellow jurors. Taylor v. Geiger, Hard. 597; Steel's Heirs v. Logan, 3 Mar. 397; Allard v. Smith, 2 Met. 30; Lucas v. Cannon, 13 Bush, 650; Doran v. Shaw, 3 Mon. 415; Commonwealth v. Skeggs, 3 Bush 19; Johnson v. Davenport, 3 J. J. M. 390; Smith's Admx. v. Middlesboro Electric Co., 164 Ky. 64; Beard v. Commonwealth, 149 Ky. 632; Heath v. Conway, 1 Bibb 398; Howard v. Commonwealth, 24 K. L. R. 612; Gleason v. Commonwealth, 145 Ky. 128. Section 272, Criminal Code provides, that "a juror cannot be examined to establish a ground for a new trial, except it be to establish that the verdict was made by lot." Hence the affidavit of the juror offered on the motion for a new trial could not be received to establish a ground for a new trial, except the ground be that the verdict was arrived at by lot.

B. A third ground, upon which a reversal is asked, is that the accused was surprised by the testimony of the witness, John Watkins, given upon the trial, in that, he insists, the witness deposed, that the first shot was fired from within the crib, and before firing the second shot, the accused came from out of the crib, and that the effect of this testimony was to induce the jury to believe, that the accused was lying in wait in the crib, for the approach of the deceased, and to entirely disregard the evidence of the accused, to the effect, that he did the shooting in his necsesary self defense, or in a sudden affray and without previous malice, and that the jury being led by the testimony of Watkins to believe that he was

lying in wait for deceased, was caused to impose upon him the severest punishment for the crime of manslaughter. He insists that in fact and truth the witness Watkins, from the place, where he was, when the shooting took place, on account of the situation of the crib to him, could not and did not see, where appellant was when he fired the first shot, and could not and did not see him come out of the crib just before firing the second shot, and that he will be able upon a new trial to prove the above stated statements of Watkins to be untrue, by other witnesses, including Watkins himself and in support of his claim, he filed the affidavits of one person, who states that Watkins from the place occupied by him could not have seen the door of the crib, at the time of the firing of the first shot, nor could he have seen the accused come out of the door before firing the second shot, and with it is filed an affidavit of Watkins. Watkins, however, was the third witness introduced by the Commonwealth's attorney, after whom he introduced five other witnesses in chief, and then the accused testified and then introduced twelve witnesses, in chief, and then for the Commonwealth four witnesses testified in rebuttal. The accused and two or three of his witnesses deposed, that Watkins from the place where he was, could not have possibly seen the door of the crib, either at the time of the firing of the first shot, or at the time the second shot was fired, and hence that any statement made by him as to the first shot being fired from within the crib or that accused came out of the crib just before firing the second shot was untrue. No suggestion was made by appellant, that he was taken by surprise by the statements attributed to Watkins, nor did he ask for a postponement or continuance of the trial, and the discharge of the jury, on account of the surprise, which he now claims, so as to enable him to show the testimony of Watkins to be untrue, and for the first time makes such a claim in a motion for a new trial, which is, too late for relief upon that account, after having elected to take his chances in the trial, with the witnesses and evidence, he then had at hand. Rose v. Commonwealth, 181 Ky. 337.

C. The remaining ground for a reversal is that the court abused its discretion in denying him a new trial upon the ground of evidence, discovered by him since the trial. The appellant files the affidavit of one Hacker, who deposes, that he has been at the points where the witness, John Watkins, deposed that he was, when the shots were fired, which caused the death of the deceased,

and that at neither of the places can one on foot or horseback see the door of the crib, or any one come out of or go into the crib. He, also, filed an affidavit of the witness, John Watkins, and the Commonwealth's attorney filed a second affidavit of the same witness. He, also, filed the affidavits of three other persons, who depose, that from the point where Watkins was when the first shot was fired, one can see a man come·out of the crib, but cannot see him when in the crib; that a man can be seen from that point standing with his foot against the door sill and when he steps out of the door, and from the point where Watkins was, when the second shot was fired, that one could see another step into or out of the door of the crib.

The witness, John Watkins, when testifying, in chief, deposed, that he heard the first shot fired, but did not see the accused at that time; that he saw the smoke caused by that shot in front of the crib, and that the smoke came from in the direction of the crib; that accused came out from the crib, just before the firing of the second shot, and was about eight feet from it; when he fired it. Upon cross-examination when asked: "Now do you know and mean to tell the jury, where Mr. Sizemore was at the time he shot that first shot?" Ans. "I couldn't see Jeff, the first shot. The smoke come from towards that little house." Ques. "You don't know where he was when he shot that first shot?" Ans. "No, sir; I couldn't see him." Ques. "You don't mean to tell the jury, that he was in that house?" Ans. "Smoke come out that house." Ques. "Do you mean to tell the jury that this defendant was in that house when that first shot was fired?" Ans. "Yes, sir." Ques. "Did you see him?" Ans. "No, sir." Ques. "You simply heard the shot?" Ans. "Yes, sir, and saw the smoke." Ques. "Where was the smoke?" Ans. "Smoke come straight from this house." Ques. "It came from the direction of that house towards the road?" Ans. "From the house towards the road." Ques. "At that time did you see the defendant?" Ans. "No, sir." Ques. "You saw some smoke?" Ans. "Yes, sir." Ques. "You think it came from the direction of the house?" Ans. "Yes, sir, I think it came from out of the house." Ques. "That is what you think about it?" Ans. "Yes, sir." Ques. "When you first saw the defendant he wasn't in the house?" Ans. "He came from the house." Ques. "From towards the house?" Ans. Yes, sir, from towards the door." Ques. "You didn't see him come out of the door—you don't mean to say that do you?" Ans.

"Yes, sir; he come from out of the house." Ques. "You mean to tell the jury you saw the defendant come out of the house?" Ans. "Yes, sir."

Watkins, in the affidavit filed by the appellant deposes, that he was mistaken when he testified that he saw appellant come out of the crib just before the second shot was fired; that he could not then see the door, and he did not see the appellant come out of the door and did not intend to testify, that he was in the crib, when the first shot was fired. In the second affidavit, made by Watkins he deposes, that when the first shot was fired, from the place where he was, he could have seen a man standing in front of the door of the crib. He saw the smoke and it appeared to be coming from the door, but he could not then see the door; he saw the appellant fire the second shot, and at the place he then was, he could not see in at the door of the crib, but could see a person just as he would step off of the door step or out of the crib onto the door step, and that it appeared to him, that appellant came out of the house or stepped off of the door sill. It is apparent that there is no substantial difference between the testimony given by the witness upon the trial and the statements made in the second affidavit made by him; that is, that he did not see the accused, when he heard the first shot, but he saw the smoke from the gun and it appeared to come from the crib toward the road; that before he heard the second shot, he could not see the door of the crib, but that he saw the accused, as it appeared to him, step from the door step or out of the door upon the door step, and that he proceeded out from the house about eight feet, and discharged the gun a second time. On the cross-examination, he was caused to state conclusions of his from the facts stated by him, but, when all of his statements are considered together, it is apparent, what he stated as facts, and what conclusions were deposed to by him, as facts, and the jury was evidently not misled in any way as to the facts to which the witness deposed, and as to which of his statements were conclusions, else it would have returned a verdict for murder instead of manslaughter. If a new trial was had, it is clear, that the witness would depose as stated in the second affidavit, and all the purpose the first one would serve, would be to contradict or impeach the witness, if it in fact would have that effect, and a new trial is never granted to permit a witness to be impeached, or on account of evidence which is merely

cumulative, unless the new evidence is of such a clear and convincing character as to have a decisive influence upon the evidence, which is proposed to be overturned, and to be reasonably calculated to change the result of the trial had. The testimony of Hacker, would be merely cumulative, and in view of the real evidence of Watkins would have no decisive effect. Ellis v. Commonwealth, 146 Ky. 715; McElwain v. Commonwealth, 146 Ky. 104; May v. Commonwealth, 153 Ky. 141; Price v. Thompson, 84 Ky. 219; Hayes v. Commonwealth, 140 Ky. 184; Wallace v. Commonwealth, 167 Ky. 277.

No error prejudicial to the substantial rights of the appellant appearing, the judgment is affirmed.