CASE 6.—PROSECUTION AGAINST RUFUS BROWDER FOR
MURDER.—December 17, 1909.

## Browder v. Commonwealth

Appeal from Logan Circuit Court.

W. P. SANDIDGE, Circuit Judge.

Defendant Convicted and appeals.—Reversed.

1. Criminal Law—Venue—Change—Local Prejudice.—Accused,
a negro, killed his employer, a prominent white man. A
mob attempting to lynch accused on the night he was placed
in jail, being balked in that design, and no effort having been
made to punish any of them, when accused was removed be-
yond their reach, took four innocent negroes, friends of ac-
cused, and hanged them. This deed led the people to ap-
prehend a counter attack by the negroes, which resulted in
a midnight alarm, when all the men of the place were called
to arms, only a week before accused's application for a
change of venue was heard. Up to the time of the trial, the
condition of public sentiment in the county was such that it
was impossible to induce a member of the local bar to take
part in the defense. Held, that accused was entitled to a
change of venue under Ky. St. 1909, Section 1109,
(Russell's St. Sec. 3219), providing therefor, when it appears
that accused cannot have a fair trial in the county where
the prosecution is pending.
2. Criminal Law—Change of Venue—Determination.—In decid-
ing the question of a change of venue, the court will not be
concluded by the opinion of witnesses, but will look to the
facts for itself, since it may happen that the same feeling

which prevents his having a fair trial may prevent him from obtaining witnesses to so testify on motion for a change of venue.

3. Criminal Law—Venue—Change—Application—Necessity for Renewal upon Second Trial.—Where accused at his first trial applied for a change of venue, which was denied, he was not required to renew his application at a second trial, after a disagreement, to save his rights, since the law only allows one application.

4. Criminal Law—Evidence—Physical Examination of Accused. —In a murder case, where accused claimed that he shot in self-defense, and it was admitted that decedent shot once at accused, who claimed that decedent had shot twice, the court should on accused's motion, order him to be taken from jail to a doctors' office for X-ray examination to show whether he was shot in the breast, the bullet having lodged in his back; such fact, if proved, tending to strengthen his testimony as to what occurred at the time of the homicide.

5. Criminal Law—Evidence—Limiting Effect of Impeaching Testimony.—In a murder case, decedent's wife testified to being present and seeing what took place at the time decedent was shot, and being asked if, at the inquest, she did not testify that she was in the house and did not know what took place, stated that she did not so testify, whereupon accused introduced testimony that she did so testify before the coroner's jury, and the commonwealth introduced witnesses to the contrary. Held, that the court should have charged that all testimony as to what the wife said before the coroner's jury should only be considered on the question of her credibility, and not as substantive evidence of what in fact took place at the time decedent was killed.

SIMS, DU BOSE & RHODES for appellant.

JAS. BREATHITT, Attorney General, and T. B. BLAKEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HOBSON—Reversing.

Rufus Browder, a negro, shot and killed James Cunningham, an influential white man, in Logan county on July 13, 1908. At a special term held in August he was indicted for murder. His motion for

a change of venue was overruled, and the case coming on for trial in February, 1909, he was found guilty as charged, and his punishment fixed at death.

The first question arising on the appeal is as to the propriety of the ruling of the court refusing the defendant a change of venue. By section 1109, Ky. St. 1909 (Russell's St. sec. 3219), when it appears that the defendant can not have a fair trial in the county where the prosecution is pending, the judge shall, upon the application of the defendant, order the trial to be had in some adjacent county to which there is no valid objection; or, if he is satisfied that a fair trial can not be had in an adjacent county, he may order the trial to be had in the most convenient county in which a fair trial can be had. By section 1110 (Russell's St. sec. 3220) the defendant's application must be made by petition in writing, sworn to by him, and must be supported by the affidavits of two other credible persons not of kin to him or of counsel for him, stating that they are acquainted with the state of public opinion in the county, and verily believe the statements of the petition to be true. The defendant's application was regularly made, and was supported by the affidavits of two persons as provided by the statute. On the hearing of the application a number of witnesses were introduced both for the defense and the commonwealth. The facts, as shown by the defendant, are in substance, these: The shooting took place on the morning of July 13th about 7 o'clock. The defendant fled after the shooting. The sheriff of the county was telephoned to, and arrived on the scene about 10 o'clock. When he reached there several parties of men armed with guns were out hunting for the defendant. This continued until about 1 o'clock. The father of the defendant was apprehensive that his son would be killed if

found, and finally an agreement was reached between him and the sheriff by which the sheriff agreed to protect the defendant from harm at the hands of the searchers and take him to jail, and the father agreed to take the sheriff where his son was. This agreement was had between the father of the defendant and the sheriff after the sheriff consulted with the men who were hunting for him, and was faithfully carried out on all sides. The shooting occurred about 12 miles from Russellville, the county seat. The defendant was placed in jail. The jailer being apprehensive that a mob would come took the defendant out of jail at dusk, and took him over to a burying ground, and there left him in charge of another while he returned to the jail. Not long after his return to the jail the mob arrived. The jailer informed them that the prisoner was not there, and he did not know where he was. They then went to the sheriff thinking that he had him, and the sheriff told them that he did not know where he was. Thinking that the sheriff and the jailer were misleading them, they then went to the jail and made the jailer come with them to the sheriff so as to bring the two face to face. Not learning in this way where the prisoner was, they returned and searched the jail. The night train passed the station soon after this, and thinking that he might be taken off on that train, they repaired to it and searched it. Finally, not being able to find him, later in the night they disappeared. The next morning the prisoner was placed on the train and taken to Bowling Green. It being learned by the authorities there that a raid on the jail was contemplated, he was taken from there to Louisville. This was soon learned in Logan county. In the meantime four negroes, two of whom were witnesses for the defendant, and two members of his lodge, had been

arrested for some misdemeanor, and placed in jail at Russellville. These men were from the neighborhood in which the defendant lived, and some of them had been about his father's house when the search was made for the defendant on the day of the homicide. On the night of July 31st another mob appeared at the jail at Russellville. The jailer did not resist them, and they took out of the jail these four men who were in no way connected with the homicide, and against whom no charge had been preferred except such as a breach of the peace or carrying concealed weapons, and immediately hung all four of them in the most cruel manner, putting upon their bodies placards to the effect that the negroes take warning and disband their lodges. On the night of August 3d, after these four men had been killed in the manner pointed out, a rumor about midnight reached Russellville that the negroes had organized and were marching on the town. Fire alarms were rung. The people were aroused. All the men capable of bearing arms rushed to the public square and patrolled the town until morning. But no negroes came. The motion for a change of venue was entered about August 1st. It was heard on August 10th. The two men who had signed the affidavits supporting the defendant's petition for a change of venue were notified in substance by an anonymous writing, "We shall get you next." Unable to employ counsel in Logan county, the defendant went to Bowling Green and employed a firm of lawyers there. They took the employment upon condition that a lawyer at Russellville was to be employed. A lawyer there was employed and was to be paid $200 to assist the Bowling Green lawyers on the trial. The pressure on

him there was such that, in a short time, he notified the defendant that he must get out of his case, and could not attend to it. Being unable to employ another attorney in Russellville, they then employed an attorney who lived in an adjoining county, but who regularly attended the courts at Russellville. An agreement was made by which he was to be paid $500 to assist the Bowling Green lawyers on the trial of the case. He came to Russellville, and after being there a short time he notified his colleagues that his interests in the county were such that he could not afford to sacrifice them, and that he must retire from the case. The result was that no lawyer could be obtained in the county even to assist the Bowling Green lawyers in the selection of a jury. Although two mobs had visited Russellville, and although one of them had taken possession of the jailer and marched him around the·streets and had faced the sheriff, searched the jail, and gone through a railroad train, while the other had opened the jail and hung openly four innocent and unoffending men, no arrests had been made for all this, no indictments had been found, and, so far as the record shows, no effort had been made to bring the guilty parties to justice. Cunningham was the employer of Browder. The difficulty between them grew out of the fact that Cunningham had ordered Browder to vacate the house he was living in. The negroes in the neighborhood had organized lodges, and the impression prevailed among the whites that in these lodges schemes were concocted unfriendly to the whites.

When the trial came on, the Governor sent troops, who were present during the trial, and it passed off quietly. At the first trial in October the jury did not agree, and the case was tried a second time in Febru-

.ary, with the result stated. A number of witnesses
for the commonwealth testified that in their judg-
ment the defendant could undoubtedly get a fair trial
in Logan county, among them the sheriff, the jailer,
the county judge, and a leading member of the bar.
These witnesses stated that the homicide occurred
in the southern part of the county near the Tennes-
see line; that in the northern, eastern, and western
parts of the county there was no feeling against the
defendant, and no reason existed why he should not
have, a fair trial. The testimony for the common-
wealth to this effect is practically uncontradicted;
for the witnesses introduced by the defendant in the
main testified to the facts above stated which are
also uncontradicted. In cases like this the court will
not be concluded by the opinions of witnesses, but will
look at the facts for itself; for it may happen that
the strong feeling against the defendant in a county
which prevents his having a fair trial may prevent
him from obtaining witnesses to so testify on his
motion for a change of venue. If the defendant had
killed a negro, or if he were a white man, and had
killed a white man, we might look at the case differ-
ently; but we can not shut our eyes to the fact that
here was a case of race prejudice excited to the white
heat. A prominent white man had been shot by a
negro laborer working for him. The mob wished to
execute the negro summarily the night he was placed
in jail. Being balked in that attempt, and no effort
having been made to punish any of the offenders,
when the defendant was removed beyond their reach,
they wreaked their vengeance on four innocent ne-
groes whose only offense was that they were friends
of his. This deed was so uncalled for and so shock-
ing that it excited in the minds of people an appre-

hension of a counter attack by the negroes on Russellville, resulting in the midnight alarm, when all the men of the place were called to arms, and this was only a week before the defendant's application for a change of venue was heard. To say that the defendant could have a fair trial in Russellville under such circumstances is to shut our eyes to the conditions which must have prevailed when such things as we have detailed took place. We can not but know that race feeling was so excited that the defendant, who was the immediate occasion of the excitement, could not have a fair trial.

It is earnestly urged, however, that the defendant did not renew his motion for a change of venue at the February term, after he had secured a hung jury at the trial in October; and it is earnestly insisted that when he was tried in February the excitement had died down, and that he then could have as fair a trial in Logan county as anywhere. When he had made his motion in August and it had been overruled, he was not required to renew it. It may be that conditions were not as bad in February as they were in August, but he had a right, under the law, to a trial in another county where such excited conditions did not prevail. The law only allows one application for a change of venue. If the court overrules the motion, and at the following term should be satisfied that a change of venue should be granted, he may, in his discretion, set aside the order overruling the motion, and grant the change of venue. The defendant may call upon him to do this where he can produce new evidence, or other facts have transpired since the hearing showing that a change of venue should be granted. But he is not required to renew his motion in order to preserve his rights. The court having

once considered the matter, and refused to change the venue, he may assume that the court will adhere to his ruling. In view of all the facts here, we are clearly of opinion that the ends of justice require that a change of venue be granted the defendant. Up to the trial the condition of public sentiment in the county was such that it was impossible to induce a member of the local bar to take part in the defense. The defendant did not deny the shooting, but claimed he shot in self-defense. The deceased after the shooting had a pistol. It was admitted he had shot once at the defendant, and the latter said he had shot twice, the first shot being the beginning of the difficulty. The decedent had up to that time borne a good character. The facts that followed point unerringly to race hostility. When the public mind is excited by race hostility the feeling may smolder, but, though not apparent on the surface, it does not soon die out, on the contrary often the sentiment spreads and strengthens.

The defendant moved the court to continue the case in order that he might be examined with the X-ray by a physician to show that he was shot in the breast and that the bullet had lodged in his back. The court on the return of the case will make an order allowing the defendant to be taken from jail to the doctor's office, so that the examination may be made, as the X-ray machine can not be taken to the jail; and this fact, if proven, would tend to strengthen the defendant's testimony as to what occurred at the time of the homicide. Mrs. Cunningham testified on the trial to being present and seeing what took place at the time her husband was shot. She was then asked if she did not, before the coroner's jury, testify that she was in the house and did not know what took

place, and said she did not so testify. The defendant then introduced testimony tending to show that she so testified before the coroner's jury. The commonwealth was then allowed to introduce other witnesses who testified, in substance, that Mrs. Cunningham did not so testify before the coroner's jury. The court should have admonished the jury that all this testimony as to what Mrs. Cunningham said before the coroner's jury was only to be considered by them on the question of her credibility, and not as substantive evidence of what in fact took place at the time the deceased was killed.

Judgment reversed, and cause remanded for further proceedings consistent herewith. All concur.