## Wallace, et al. v. Commonwealth.

(Decided December 10, 1915.)

## Appeal from Clark Circuit Court.

1. Criminal Law—Change of Venue—When Granting of Authorized—Not Ground for Reversal in Absence of a Showing of Abuse of Discretion.—Section 1112, Kentucky Statutes, provides: "Whenever any judge shall be satisfied from his own knowledge, and from the written statement of the Commonwealth's Attorney, that such a state of lawlessness exists in any county that the officers will be prevented from discharging their duty or the jury deterred from rendering an impartial verdict, he may order the prosecution removed to some other county in which a fair trial can be had." The exercise by the trial court of the discretion conferred by this statute, either in granting or refusing a change of venue, will not be reversed, unless it is made to appear that such discretion has been abused.

2. Criminal Law—Appeal and Error—Complaint of Improper Conduct of Trial Court—When Not Reversible Error.—An alleged improper remark made to a witness in the hearing of the jury by the judge of the trial court will not be considered as a ground for reversal on appeal, where the remark was trivial and immaterial, or the record fails to show that it was objected or excepted to by the appellants when made.

3. Criminal Law—County Attorney—Alleged Misconduct of—When not Reversible Error.—Where counsel of appellant in making for him the closing argument to the jury, was interrupted by a county attorney, aiding in the prosecution, by a denial that the appellant testified to a statement attributed to him by his counsel, such interruption will not constitute reversible error, as the county attorney was rebuked by the court for interrupting appellant's counsel, and the court later, and before the submission of the case to the jury, read to them from the transcript of its stenographer the testimony given by appellant as to the matter about which his counsel was interrupted by the county attorney, which showed that appellant had made the statement attributed to him by his counsel and denied by the county attorney. Nor was the county attorney, after quoting from a witness as to a conversation he had with one of the defendants, jointly indicted, and saying that it had never been denied, guilty of misconduct constituting reversible error, as the trial court, upon appellant's objection, admonished the county attorney and the jury that the remark was improper and the statement did not necessarily refer to the failure of the defendant in question to testify on the trial; in the connection used the statement will be regarded as meaning that the testimony of the witness quoted stood undenied or uncontradicted by any one.

4. Criminal Law—Voluntary Manslaughter—When Failure of Court to Give Instruction Defining Voluntary Manslaughter Will Not be

Reversible Error.—The failure to give an instruction as to voluntary manslaughter is not reversible error, where the evidence introduced by the Commonwealth all conduced to prove that the homicide was a deliberate murder, and that of the accused was wholly to the effect that in killing the deceased they acted in self defense. It is for the trial court to say whether there is any evidence of legal provocation which could reduce the homicide from murder to manslaughter. If there is, then it is not for the court to attempt to determine the degree or to estimate the value of such evidence, but it should, without weighing it, give an instruction defining voluntary manslaughter; if there is no such evidence the instruction should not be given.

5.  Criminal Law—New Trial—When New Trial Will Not be Granted on the Ground of Newly Discovered vidence.—Newly discovered evidence of admissions of a prosecuting witness contrary to his or her testimony, is not sufficient to authorize a new trial. Such admissions can be used only as impeaching evidence, and a new trial will not be granted for this purpose. A new trial asked upon the ground of newly discovered evidence, based upon an affidavit of the widow of the person killed by appellants, retracting testimony hurtful to them given by her in behalf of the Commonwealth, but which affidavit she, in one later filed by her, declared she had given under duress and by the fraud of the appellants' relatives; that the statements of the affidavit obtained from her by the relatives of appellants were false, and that on a second trial of the case she would adhere to the testimony given by her on the first trial, was properly refused. If, upon such a showing, a new trial were granted, it would merely afford appellants an opportunity to attempt to impeach and discredit the widow of the deceased as a witness, and in large measure divert the trial into an attack upon her reputation for veracity, without developing any new facts tending to show the appellants' innocence. Besides, although the testimony of the widow of the deceased given on the last trial was doubtless important and material in leading to the conviction of appellants, there was other evidence as to their guilt equally strong and convincing.

JOHN M. STEVENSON, JOHN NOLAND, A. F. BYRD and C. C. & WM. WALLACE for appellants.

JAS. GARNETT, Attorney General, and D. O. MYATT for the Commonwealth.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The grand jury of Estill county, at the March term, 1915, of the Estill Circuit Court, returned a joint indictment against the appellants, T. Q. Wallace and Frank Chaney, together with Ambrose Lynch, Bill Lynch, J. M. Hynes and L. S. Gardner, charging them with the

murder of Houston Underwood. At the same term of the Estill Circuit Court, by an order thereof, the venue was changed, as provided by section 1112, Kentucky Statutes, to the Clark Circuit Court. The change of venue was made upon the motion of the Commonwealth's Attorney, supported by a written statement reciting that there existed in Estill county such a state of lawlessness that the officers of the law would be prevented from discharging their duties and jurors deterred from rendering a free and impartial verdict. Among the things charged in the statement of the Commonwealth's Attorney as indicating the prevailing state of lawlessness in Estill county, were the facts that the court house and a brick school building in the town of Irvine had theretofore been dynamited. Numerous affidavits were filed by the defendants controverting the right of the Commonwealth to a change of venue.

The defendants were jointly tried at the April term, 1915, of the Clark Circuit Court, for the crime charged in the indictment, the trial resulting in a verdict and judgment finding the appellants, Wallace and Chaney, guilty of murder and fixing their punishment at confinement in the penitentiary for life, and in the acquittal of the defendants Ambrose Lynch, Bill Lynch, J. M. Hynes and L. S. Gardner. Wallace and Chaney were refused a new trial by the circuit court and both have appealed.

The homicide occurred at the home of Houston Underwood, on the Miller's Creek road, in the town of Irvine, on Friday, February 12, 1915, about ten o'clock p. m. The deceased was shot and killed in his own house, while standing in or near the door, which he had partly opened. The killing occurred a few days after the dynamiting of the court house. It appears from the evidence contained in the record that the fiscal court of Estill county and other persons offered a reward, aggregating fifty-five hundred or six thousand dollars, for the apprehension and conviction of the parties guilty of the dynamiting of the buildings mentioned, and that Joe Spivy, town marshal of Irvine; Bige Little, a constable of Estill county, and Green Davidson, a resident thereof, acting in concert and, doubtless, with a view of obtaining the reward, were endeavoring to ascertain the identity and procure the arrest of the guilty parties, and that they were depending upon one James Carson to furnish them the information necessary to accomplish

their undertaking. They appear to have arranged for a meeting with Carson in Irvine at night, about a week before the killing of Underwood. The meeting took place as arranged, between Carson and the persons named, but without any satisfactory result.

It is apparent from the evidence that the appellants, T. Q. Wallace and Frank. Chaney, and J. M. Hynes were suspected by Spivy and his associates named of being guilty of the dynamiting of the court house. Wallace, as instigator, and Chaney and Hynes, as perpetrators, of the act, and that they were attempting to obtain from Carson and other sources the evidence upon which to arrest and convict them. On the other hand, it was the theory of the appellants, Wallace and Chaney, that there was a conspiracy on the part of Spivy, Little and Davidson to take their lives, particularly that of Wallace; but the only evidence offered in support of this theory was certain information claimed to have been given Wallace by one R. C. Williams, admittedly an unreliable person, and the several meetings held between Spivy, Little and Davidson in Irvine on divers occasions preceding the night of the killing of Underwood. It is more reasonable to infer, however, that the meetings referred to were in furtherance of the plan of Spivy, Little and Davidson to obtain information connecting the suspected parties with the dynamiting, than that they were held to devise a plan for the killing of Wallace or Chaney. In other words, the evidence introduced by appellants shows no motive on the part of Spivy, Little and Davidson for the killing of either Wallace or Chaney, but that of the Commonwealth shows that their motive was the procuring of evidence that would connect Wallace, Chaney, Hynes, the Lynches and Gardner with the crime of dynamiting the court house and school house.

It likewise appears from the evidence of both the Commonwealth and appellants that while the meetings between Spivy, Little and Davidson were in progress, there were similar frequent meetings between Wallace, Chaney, Gardner, Hynes and the two Lynches, and that Wallace and Chaney went armed for as much as a week before the killing of Underwood, the former carrying a repeating shotgun and pistol and the latter two pistols; and that the day before the killing of Underwood the appellant Wallace went from his store to that

of a contiguous merchant, to which Little had gone, and there threatened Little and attempted to provoke him into a fight. It further appears from the evidence that Carson kept the appellant Wallace informed of his interviews with Spivy and his associates and of the purpose thereof.

On Thursday evening, the night preceding the killing of Underwood, which was also the night upon which Spivy and his associates were to obtain a final interview with Carson at Underwood's house, the store of the appellant Wallace appeared to have been a place of much activity and a consultation was there held between Wallace, Chaney and Hynes, immediately following which Chaney and Hynes posted themselves in a buggy-shed near the residence of Underwood, where Davidson was known by them to be boarding. At the same time, the two Lynches stationed themselves on either side of Witt's store, into which Bige Little was known by them to have gone. It happened, however, that Davidson was not in Underwood's house that night, but had gone visiting in East Irvine. The meeting between Carson and Spivy and associates to be held at Underwood's house that night did not take place. Carson seems to have gone to the house as agreed, but being drunk at the time was ordered by Mrs. Underwood to leave, which he did. Wallace closed his store about nine o'clock Thursday night, and, armed with his shotgun and pistol, started to go home by the Miller's Creek road, which leads by the Underwood house. When within a short distance of the Underwood residence he met Chaney and Hynes. The three then returned to Wallace's store and from there went to Wallace's home by the railroad instead of out the Miller's Creek road. This altering of his course, instead of going home by the Underwood residence, as he usually did, Wallace claimed, was because of his fear that he would be assassinated from the Underwood house.

On Friday morning the appellant Wallace carried his shotgun with him to his store, as had been his custom after he learned of the efforts of Spivy and his associates to ascertain who was guilty of dynamiting the court house. On Friday afternoon Chaney and Hynes were arrested upon a warrant issued at the instance of Green Davidson, their trials being set for the week following. The same afternoon Miss Ione Wilson

met L. S. Gardner, who was jointly indicted with Wallace and his co-defendants for the killing of Underwood, and a man by the name of Hays, on Main street in Irvine, near the home of Carpenter, the county attorney, and. one or the other of them, she could not recall which, had a pistol in his hand. At seven o'clock of the same evening Lewis Wilson met Gardner in front of Carpenter's house and there had a conversation with him. Gardner declined to tell Wilson where he had been. Wilson testified as follows as to what occurred in the conversation:

"He said they had had a little rumpus up down in town. I told him I wouldn't inquire too much, he might not want to talk. He said that Tom Wallace—Professor Carpenter and some of them had tried to run down the blowing up of the court house, it had about fallen on Tom Wallace, if they didn't let Tom Wallace alone he was going to kill some one of them, and said they had been gathering guns, he was looking for trouble; said something was going to happen in town, he wouldn't be surprised if it happened that night."

On that night Underwood was killed, and shortly before the killing, the appellant Wallace sent the two Lynch boys, his co-defendants, to watch the Underwood house. He then knew that Green Davidson was in or about Master's store, diagonally across the street from Wallace's store. Davidson reached Underwood's house about half an hour before the shooting, which fact was known to the appellant Wallace. When the electric lights went out in Wallace's store and in the town, which was between nine and ten o'clock on Friday night, Wallace, in company with Chaney, W. R. Russell, William Merritt, and L. S. Gardner, left his store and apparently started out the Miller's Creek road in the direction of his home. At that time he was armed with a shotgun and pistol and Chaney with two pistols. It does not appear whether the other members of the company were armed or not. When the party got to the Jackson boarding house, which adjoins the home of Underwood, Russell, Merritt and Gardner stopped there and Wallace and Chaney went on down the street. Instead of going into the boarding house after stopping, Russell, Merritt and Gardner took their stand on the porch thereof, evidently to see and hear what was to happen at the Underwood house.

There is a contrariety of evidence as to what occurred at the Underwood residence. The evidence of the Commonwealth, furnished by Green Davidson and Mrs. Underwood, shows that Wallace and Chaney passed the house, but almost immediately returned, and upon reaching the house called for Green Davidson; that the latter answered and they asked him to come out. He replied by asking what they wanted, and they said they wanted to see him. Davidson then asked who it was, and the answer came from one of them that it was Joe Spivy, but instead of going out, Davidson requested them to come into the house. At that juncture Houston Underwood got out of bed, took from over a sewing machine a pistol that was hanging on the wall, which had been left at the house a day or two previously by Davidson, and said he would see who it was and what they wanted. As he opened the door with his left hand the parties outside began to shoot and Underwood fell mortally wounded and almost immediately died. After about twenty shots had been fired from outside into the house the appellants, Wallace and Chaney, and three or four other persons who were unknown to the occupants of the house, ran up the sidewalk in the direction of Wallace's home. According to the further testimony of Davidson and Mrs. Underwood, Underwood, his wife and two children had retired for the night before the trouble came up, and Underwood had on his night clothes when killed. Neither Davidson nor Mrs. Underwood saw the deceased discharge the pistol he had in his hand or knew that he had done so, but they discovered after the shooting that one chamber of the pistol was empty. The shot which killed Underwood was received from a shotgun. Davidson testified that he recognized the voice of Chaney as one of the persons talking from the outside, but did not recognize the voice of T. Q. Wallace, and that when they were calling to him from the outside he went to the window, raised the shade, looked out and saw that there were two or three men standing on the street, one of whom he recognized as T. Q. Wallace. Mrs. Underwood testified that she recognized one of the voices as that of Wallace and that she saw three or four men run up the sidewalk immediately after the shooting.

Vernon Snowden, who happened to be on the street or in a house not far distant, heard a voice or voices

talking on the outside of the Underwood house immediately before the shooting began. It is evident from the statements of various witnesses testifying in behalf of the Commonwealth that two or more persons besides the appellants, Wallace and Chaney, ran from the Underwood house immediately following the shooting, and that these additional persons were evidently concealed upon or in the immediate vicinity of the Underwood premises at the time of the shooting.

According to the testimony of the appellants, Wallace and Chaney, they fired, between them, twenty-one shots into the house of Underwood, and the former admitted to Grant Underwood and A. F. West after the shooting that he was the man who had killed Houston Underwood, saying, however, that he had killed the wrong man, as he had aimed to kill Green Davidson. He also told Mrs. Christopher, after the killing, that he had done what he wanted to do and if it was to do over he would do it again.

In addition to the above admissions on the part of Wallace, both he and Chaney testified on the trial that immediately after passing the house of Underwood two shots were fired at them from within the house, which they returned by firing into the house; that in returning to their homes that night they feared assassination, either from the Underwood house or some other place of concealment, for which reason they went armed on that night as on the several days preceding the killing; that because of an alleged conspiracy on the part of Spivy, Davidson and Little, of which they claimed to have received notice from time to time, they had been apprehensive for several days of an attempt to assassinate them, and that in firing into the house of Underwood on the occasion of the killing they acted in self-defense and only with the intention of protecting their lives and persons against death or great bodily harm at the hands of the persons who fired upon them from the house.

Russell and Merritt, introduced in their behalf, claimed to have been with Gardner on the Jackson porch near the Underwood house at the time of the killing, and testified that they first heard two shots, and after a brief interval these two shots were followed by a fusilade of shots, the number of which they were unable to tell. The testimony of these two witnesses is all that appears in

the record which tends, in any way, to corroborate the testimony of the appellants that they were twice fired upon from the Underwood house before any shots were fired by them.

In view of all the evidence, it seems to us that the theory of the Commonwealth, that the first shooting was done by the appellants upon the opening of the door by the deceased, is more reasonable than that of the appellants, that they were fired upon from the house before shooting themselves. It is pertinent here to remark that appellants make no claim, nor does any of their evidence tend to show, that Houston Underwood, the deceased, was involved or connected with the alleged conspiracy upon the part of Spivy and others to take their lives. He was not at any of the meetings held by them, or that took place between them and Carson. It does not appear from the evidence that he was related to Spivy, Little or Davidson, or that he was seeking or expecting any part of the reward offered for the arrest and conviction of the dynamiters of the court house or school building. He entertained no ill-will towards Wallace or Chaney, and the fact that he was in his night clothing at the time he was killed convincingly demonstrates that he was not lying in wait to assassinate them. Moreover, if such purpose had been entertained by him or Davidson, who was in the house at the time, he or they would more naturally have shot from the window of the house overlooking appellants, instead of from the door, the opening of which would have given appellants as good an opportunity for shooting in the house as it would have afforded Underwood and Davidson for shooting therefrom, to say nothing of the danger to which the opening of the door exposed Underwood's wife and two little children from the shots that might be expected to be fired into the house by appellants.

In this connection it will be proper to pass upon appellants' complaint that the verdict is flagrantly against the evidence, which is one of the grounds relied on for a reversal of the judgment of the circuit court. It is apparent from what we have said of the evidence that this contention is wholly without merit. While the foregoing statement of the proof with respect to the killing is not elaborate, it is believed to be accurate and sufficiently comprehensive to present all the material facts shown by and deducible from the evidence as a whole;

and, assuming this to be so, no reason can be urged for sustaining appellants' contention that the verdict is flagrantly against the evidence. On the contrary, it can be argued with greater show of reason that the verdict was authorized by the evidence.

The above conclusion likewise disposes of appellants' further complaint of the ruling of the court in refusing the peremptory instruction, directing a verdict of acquittal as to them, for, which they asked after the introduction of the evidence for the Commonwealth.

Other grounds urged for a reversal are: (1) That the trial court erred in granting the change of venue; (2) improper conduct of the court; (3) misconduct of county attorney; (4) improper argument of county attorney; (5) failure to properly instruct the jury; (6) newly discovered evidence.

As to the matter of the change of venue, it is not to be overlooked that it was not granted by the judge who presided at the trial of appellants in the Clark Circuit Court, but by the judge of the Estill Circuit Court, in whose judicial district the killing of Underwood occurred. Section 1112, Kentucky Statutes, provides:

"Whenever any judge shall be satisfied *from his own knowledge,* and from the written statement of the Commonwealth's Attorney, that such a state of lawlessness exists in any county that the officers will be prevented from discharging their duty, or the jury deterred from rendering an impartial verdict, he may order the prosecution removed to some other county in which a fair trial can be had * * *"

The circuit judge who granted the change of venue in this case is a resident of the town of Irvine and must be presumed to have had personal knowledge as to whether the conditions required by the section, *supra,* existed in Estill county, and, if so, the statute gave him the right to act upon such personal knowledge and the written statement of the Commonwealth's Attorney, showing the existence of the conditions referred to. If the conditions did exist, the Commonwealth could not have had a fair trial in Estill county. We have repeatedly held that the exercise by the trial court of the discretion with which the statute vests him, either in granting or refusing a change of venue, will not be reversed, unless it appears from the record that such discretion has been abused. Hargis v. Commonwealth, 135 Ky.,

578; White v. Commonwealth, 120 Ky., 178; Chaney v. Commonwealth, 149 Ky., 464.

In Commonwealth v. Carnes, 125 Ky., 821, we held that where a written statement of the Commonwealth's Attorney that lawlessness existed in the county, was filed as ground for a change of venue, pursuant to section 1112, Kentucky Statutes, which fact was personally known to the judge, no further proof was required to change the venue. In our opinion, the granting of the change of venue in this case was eminently proper.

The alleged improper conduct of the trial court complained of consisted of a statement made in the hearing of the jury to Mrs. Underwood, the chief witness for the Commonwealth, during her examination. Besides being too trivial to require notice, the statement of the court was not objected or excepted to by appellants at the time the language was used. It is well settled that objection must be made and exception taken in such case to obtain a review of the alleged error by this court. Smith v. Commonwealth, 119 Ky., 286; Carter v. Commonwealth, 131 Ky., 245.

The misconduct attributed to the county attorney in the third ground urged for a reversal is that when Mr. J. M. Stevenson, of counsel for appellants, stated in his argument to the jury that the appellant Wallace had proposed to the county judge of Estill county, shortly before the killing of Underwood, that he would execute a peace bond provided Green Davidson, Joe Spivy and Bige Little would also execute such bonds, and that these bonds were not executed, as Wallace testified, because the county attorney of Estill county would not agree to it, Mr. Carpenter, the county attorney, who was present and assisting in the prosecution, interrupted Mr. Stevenson in his argument by stating to him, in the presence of the jury, that "he did not do it," meaning that Mr. Stevenson was not correctly quoting the testimony of Wallace, and when Mr. Stevenson remarked that Wallace had so testified to the jury, Mr. Carpenter further said "he did not do it." Thereupon Mr. Stevenson appealed to the court, who stated that he did not remember it that way, but it was for the jury to remember just what the evidence was, following which statement he admonished Mr. Carpenter not to interrupt Mr. Stevenson again.

On the following morning a transcript from the official stenographer's report of the evidence, showing that the appellant Wallace had made the statement attributed to him by Mr. Stevenson, was presented by his counsel and the court asked to correct the statement that had been made by the county attorney, Mr. Carpenter, on the day before. After the conclusion of the argument and before the case was finally submitted to the jury, the court read to them the evidence of the appellant Wallace with reference to the execution of the peace bond, contained in the transcript offered by his counsel, which advised the jury that he had been correctly quoted by Mr. Stevenson in his argument, and that the county attorney was mistaken in asserting that Wallace had not so stated. In pursuing the course indicated, the trial court manifestly said and did all that was necessary to destroy the prejudicial effect of what had been said and done by Mr. Carpenter when he interrupted the argument of Mr. Stevenson.

Appellants' fourth complaint is as to what was said by Mr. Carpenter, county attorney of Estill county, in his argument to the jury, in quoting and commenting upon certain statements of witness Lewis Wilson. In quoting the witness he said:

" 'I come up here; he was standing out on the walk near the walk. Mr. Gardner come up; I asked him his business up there. He said it was a secret.' "

Following this quotation, Mr. Carpenter said to the jury:

"Has that ever been denied, I want to ask you, gentlemen of the jury?"

It appears from the record that appellants' counsel objected to so much of Mr. Carpenter's statement as was contained in these words, "Has that ever been denied," and that the court sustained the objection, saying at the time that the remark was improper. It is insisted for appellants that the above statement was prejudicial to them, because it was an allusion to the fact that Gardner, who was one of the defendants, had failed to testify on the trial. We fail to see that appellants could have been prejudiced by the statement in question. While the court did not admonish the jury not to consider it, doubtless because he was not requested to do so, he did, in the presence and hearing of the jury, promptly sustain the objection made by appellants' counsel to the

statement, which, under the circumstances, substantially amounted to an admonition to the jury not to consider it.

Nor do we think that the statement made by Mr. Carpenter would have been sufficiently prejudicial to the appellants to constitute reversible error, had the court failed to sustain the objection made by their counsel to it. The statement did not necessarily refer to the failure of Gardner to testify on the trial. It was a broad statement to the effect that the testimony of the witness Wilson stood undenied or uncontradicted by any one.

With respect to the effect of a similar statement made by counsel in argument to the jury, we, in Johnson v. Commonwealth, 29 R., 675, said:

"The contention that the Commonwealth's attorney was guilty of misconduct in argument is, in our opinion, also without merit. It is charged that he said in the closing argument to the jury: 'No one denies that he killed his wife. Nobody has denied that he had a knife,' and that the finger of the attorney was pointed at the appellant when this language was used. It does not satisfactorily appear that the statement in question was intended as a criticism upon the appellant's failure to testify as a witness on the trial. It is not unreasonable to conclude that the attorney by it meant to say, and did in effect assert, that the fact of appellant's guilt and of his having had and used a knife in committing the crime, had not been denied or controverted by any witness whose testimony was given in the case. The pointing of his finger at appellant was doubtless meant to indicate that he was the only person involved by the evidence; that he had done the stabbing with a knife; and he was the person whose guilt was not denied or controverted by any witness in the case." Tudor v. Commonwealth, 19 R., 1039; Farley v. Commonwealth, 165 Ky., 603.

Appellants' contention that the court in instructing the jury failed to give all the law of the case cannot be sustained. No criticism is offered of the instructions that were given. It is only contended that one should have been given defining voluntary manslaughter, under which the jury would have been permitted to determine whether the appellants were guilty of that offense instead of that of murder, charged in the indictment. In view of the evidence in the case the giving of an

instruction as to voluntary manslaughter would have been improper. Under the evidence the homicide was either murder or self-defense, there being no middle ground. If the killing occurred as the evidence introduced by the Commonwealth conduced to prove, it was a deliberate murder, or assassination, rather, without any extenuating circumstances. On the other hand, if it occurred as testified by the appellants themselves, it was a case of self-defense, after deliberate and ample preparation. We, therefore, concur in the conclusion expressed in the written opinion of the judge of the trial court, that there was no evidence whatever upon which to predicate an instruction as to voluntary manslaughter.

In Helm v. Commonwealth, 156 Ky., 751, it is in the opinion said:

"In Chambers v. Commonwealth, 6 R., 448, this court said: 'If a person permits his passions to be inflamed by something which is not a legal provocation, and while under the influence of such passion and moved thereby he kills, he is guilty of murder.' The sufficiency of provocation to extenuate murder is generally a question of law. 21 Cyc., 1028. In other words, it is for the court to say whether there is any evidence of legal provocation. If there is, then it is not for the court to attempt to determine the degree, or to estimate the value of such evidence. The court must then act without weighing it, but there must be some evidence before he can act. To support the defense of legal provocation and entitle accused to an instruction on voluntary manslaughter, the evidence offered by him on that issue must be of such character that, if taken and considered as absolutely true, and without considering any evidence in contradiction thereof, it would authorize the jury to return a manslaughter verdict." Mackey v. Commonwealth, 80 Ky., 345; Miller v. Commonwealth, 163 Ky., 246.

Finally, it is insisted for appellants that the circuit court erred in refusing a new trial on the ground of newly discovered evidence. In support of this ground appellants, in addition to their own affidavits, filed those of Mrs. Belle Underwood, widow of Houston Underwood, deceased, and John Horn. The new evidence set forth in the affidavit of Horn relates to and would tend to contradict what was said by Mrs. Christopher, in

testifying on the trial, as to a conversation she had with the appellant Wallace at the dinner table in the Irvine jail, in which certain damaging admissions with respect to the killing of Underwood were made by him. It is sufficient to say that if Horn, as stated in his affidavit, was present when the conversation between Mrs. Christopher and the appellant Wallace took place, that fact was known to Wallace, and reasonable diligence would have enabled appellants to procure Horn's attendance and testimony at the trial. As such diligence was not used, the new evidence disclosed by the affidavit of Horn did not entitle them to a new trial.

The affidavit of Mrs. Underwood, filed by appellants, together with a later one made by her and filed on her own motion, presents a question which seems not to have been decided in this jurisdiction. Mrs. Underwood testified for the Commonwealth as to what occurred at the time of the homicide. Not only did her testimony corroborate that of Green Davidson, the only other eyewitness to the homicide introduced by the Commonwealth, but it furnished many additional material facts supplied by no other witness, and while we do not feel justified in saying that there is not, outside of her testimony, sufficient evidence to support the verdict, it cannot properly be said that hers was not of the utmost importance to the Commonwealth. The affidavit obtained from her for the appellants states, in substance, that the testimony which she gave on the trial of appellants was, in many material respects, therein indicated, false, and procured from her by intimidation and the promise of large sums of money. This affidavit is shown to have been made and sworn to in Irvine, in the presence of relatives and friends of the appellant T. Q. Wallace.

On May 1, 1915, Mrs. Underwood, following her return to Winchester, made an affidavit in which she fully retracts the statements made in the affidavit procured of her by appellants, and reiterates the truth of the testimony given by her upon the trial; also that she was induced to make and swear to the affidavit procured from her by the appellants against her will and under duress, by which she was put in fear of her life. The last affidavit also details the manner in which that procured from her by appellants was obtained; that the first she saw of the paper it was in the hands of James Wallace,

a brother of the appellant T. Q. Wallace, and in the home of Mrs. Cox, the mother of the appellant Frank Chaney; that James Wallace then read the paper to her, which had previously been prepared, and asked her to sign it, and upon her refusal to do so, he threatened her life if she did not sign and swear to it; that at that time the door of the room into which she had been taken was locked and no one was present except Mrs. Cox, James Wallace and herself; that about two days later she was induced, under the pretense that she would be given work, of which she was in much need, to go with Mrs. Cox to the home of a Mrs. Bryant, being assured that no one would be there but Mrs. Bryant and possibly Frank Bryant; that when she got there she found James Wallace, Sid Maple and a man by the name of Stevens; that Wallace again read the paper to her and asked her to swear to it, but that she refused to do so, and did not, in fact, touch the pen; that she had some recollection that Mr. Stevens said something about swearing to the paper, but she did not know what and did not swear to the paper nor touch the pen in the presence of the persons named.

Appellants filed the affidavits of the persons instrumental in procuring of Mrs. Underwood the affidavit first given by her, who testified that the first affidavit was not procured by duress or intimidation. With reference to the last named affidavit, it may be said that the persons who made them might be expected to be willing to make the statements contained therein, though false, if they were guilty of the intimidation and fraud alleged by Mrs. Underwood to have been practiced upon her in obtaining from her the affidavit she first gave. In the opinion of the circuit court, the affidavit obtained by appellants from Mrs. Underwood, in view of the circumstances attending the giving of it by her and its procurement by them, did not authorize the granting of the new trial asked. Hence the motion therefor was overruled.

It is patent from the last affidavit of Mrs. Underwood that if a new trial were granted appellants, she would give the same testimony that was furnished by her on the last trial, which would be of no benefit to them. Therefore, it cannot be said that the affidavit obtained of her by appellants contains a showing of newly discovered evidence, in the meaning of the law, for which a new trial should be granted. If a new trial

were granted it would merely afford appellants an opportunity to attempt to impeach and discredit Mrs. Underwood as a witness, and in large measure divert the trial into an attack upon her reputation for veracity, without developing any new facts tending to illustrate the question of appellants' guilt or innocence. It is a recognized rule that a new trial will not be granted on the ground of newly discovered evidence if such evidence will only tend to contradict or impeach a witness whose testimony was given on the trial, or is only cumulative. In other words, to authorize a new trial the newly discovered evidence should be of such weighty and convincing character as to have a decisive influence upon the evidence to be overthrown by it. May v. Commonwealth, 153 Ky., 141; Ellis v. Commonwealth, 146 Ky., 715; McElwain v. Commonwealth, 146 Ky., 104; Roberson v. Commonwealth, 146 Ky., 291.

The authorities cited in the brief of appellants' counsel are not at all controlling upon the state of case here presented. There was nothing in any of them to indicate that the appellant could not get the benefit of the alleged newly discovered evidence on another trial. On the contrary, each shows that the witness would give on the new trial testimony materially different from that which had been given by such witness on the former trial, and that the change of evidence would be in favor of the appellant, thereby actually giving him the benefit of new evidence. Such is not the case here. The appellants would not receive upon another trial the benefit of any new evidence from Mrs. Underwood. A new trial should never be granted upon newly discovered evidence except upon the showing that the newly discovered evidence can be produced in the appellant's behalf upon a new trial, and when so produced that it will be material and calculated to produce a different result from that reached on the former trial; and, furthermore, that it is not merely cumulative or impeaching, and that it could not have been procured by reasonable diligence on the former trial.

In State v. Barrick, 55 S. E., 652, the defendant was convicted of rape upon the person of Martha Harbert, and moved for a new trial, upon the ground of newly discovered evidence, presented by affidavits to the effect that the prosecuting witness, following her testimony on the trial, had admitted, in substance, that the testimony

given by her was false and that the defendant was innocent of the crime charged against him.   The new trial was refused.   In the opinion it is, in part, said:

"Shall we reverse a fair trial on doubt?   New trials on after-discovered evidence, the law says, should be granted with great caution, because such evidence can be gleaned or trumped up in every grave criminal case. 14 Ency. Pl. & Prac., 807.   As to the affidavit of the prosecutrix, the accused does not pretend in his affidavit that he will or can by her prove such admission of innocence.   It is therefore not newly discovered evidence, to go before the jury by the evidence of the prosecutrix.   And she was a witness on the trial.   The truth is that all these admissions are to be used to impeach the girl as a witness, and it is everywhere held that verdicts will not be set aside on after-discovered evidence to impeach a witness on the former trial.   State v. Williams, 14 W. Va., 851; Halstead v. Horton, 38 W. Va., 727; Carder v. Bank, 34 W. Va., 38.   Some cases say that, to set aside a verdict based on false testimony, the witness must be convicted of perjury committed on the former trial.   14 Ency. Pl. & Prac., 810.   This shows how slow courts are to annul trials on the ground that a witness swore falsely.   If this were not so, where would trials end?   But a decisive view of the case is that it is proposed to use Martha Harbert's admission that Barrick is not guilty to overthrow the verdict.   'Newly discovered evidence of admissions of a prosecuting witness contrary to his testimony is not sufficient to authorize a new trial.   Such evidence is not admissible as the admissions of a party to the action, but can be used only as impeaching evidence, and a new trial will not be granted for this purpose.'   Ency. Pl. & Prac., 810.''

The following additional authorities sustain the view presented in the opinion of the case, supra, as they are all to the effect that proof that a witness in a case may substantially change his testimony on another trial, is not ground for a new trial:   State v. Blanchard, 88 Minn., 82; Lucia v. State, 77 Vt., 279; Rogers v. State, 77 Vt., 454; State v. Hyde, 22 Wash., 569; People v. Byrne, 116 Pa., 521; Shackelford v. State, 55 S. W. (Tex.), 884; Trevino v. The State, 38 Tex. Cr. Rep., 64; Drake v. State, 151 S. W. (Tex.), 315.

The doctrine announced by the foregoing authorities meets our approval, as it is consonant with reason and

justice and will tend to prevent such questionable meth-
ods as were here resorted to by appellants.

In our opinion the appellants were not entitled to a
new trial; hence, the judgment is affirmed.