## Layne et al. v. Commonwealth.

(Decided Oct. 15, 1937.)

As Modified on Denial of Rehearing Jan. 21, 1938.

WAUGH & HOWERTON, K. C. ELSWICK and ED L. ALLEN for appellants.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for the Commonwealth.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellants and Wood Meade were indicted by the grand jury of Floyd county for the murder of French Martin. Upon joint trial of Layne and Castle in the Lawrence circuit court, a verdict of guilty was returned, the jury fixing the penalty in each case at two years' confinement in the penitentiary. From a judgment in accord with the verdict an appeal is prosecuted.

Appellants insist that they were prejudiced in their substantial rights, because the court erroneously allowed the Commonwealth a change of venue from Floyd, the county in which the homicide occurred, to Lawrence, which was not a "contiguous" county, and gave erroneous instruction, (a) in improperly presenting the right of an officer when attempting to enforce.

an arrest, and (b) in improperly modifying the self-defense instruction, as given.

Taking up now the complaint that the Floyd court erred in changing the venue, the contention is that because the trial was directed to be had in a non-contiguous county, the latter was without jurisdiction. When the move for change was made in the Floyd court, it was by petition which alleged as a basis, conditions which were said to be due to wide relationship and acquaintance of the defendants, making it impossible to obtain a fair trial. Affidavits pro and con were filed. Later the commonwealth's attorney filed his statement saying that due to a state of lawlessness existing in Floyd county, the trial could not be conducted fairly therein. The motion for a change being submitted, the court ordered a change based solely on the commonwealth attorney's statement, and the court's personal knowledge. We say this because the order reads:

> "And the court being of the opinion from his own personal knowledge, and the written statement of the commonwealth's attorney, that the conditions set out * * * exist in said county, and that for these reasons and conditions a fair and impartial trial of this case cannot be had in Floyd County; it is therefore ordered by the court that the venue of this action be changed to Lawrence County."

A removal under a showing of such conditions, or the courts' knowledge of their existence, is provided by section 1112, Ky. Stats. The record shows no interposed objection. Not only so, the record shows that later the commonwealth's attorney again filed his statement under the section of the statute supra, and the court again sustained the motion and entered the following order:

> "And the court being sufficiently advised * * * sustained the motion, and by agreement of parties hereto it is ordered by the court that the venue of this case be changed to Lawrence County, Kentucky."

When the case was called in the Lawrence court, the defendants "renewed" their objection to the order changing the venue to Lawrence, and filed special demurrer to the jurisdiction of the Lawrence court "because the crime was committed in Floyd, and the in-

dictment returned in Lawrence" (which was done after their motion to quash the Floyd county indictment), and because the removal was not to be a contiguous county. The motion and demurrer were overruled, with exception. Thus we are led to the conclusion that the argument here goes only to the question of the jurisdiction of the Lawrence court, on the ground that Lawrence county was not one contiguous to Floyd. We do not find any motion to remand the case to Floyd based on the provisions of section 1120, Ky. Stats., which provides for such when the court, from his personal knowledge or reliable information, concludes that the reasons for the removal no longer exist in the county from which the case was removed. No showing was tendered as a basis for such remand.

From the record it appears that the first objection was not directed to the change to Lawrence county, but to any change of venue. This is true, because, as we have shown, they did not object to the first order of removal, and agreed to the second order referred to above. The matter of a change of venue, as we have often said, rests in the sound discretion of the court, and the court's ruling thereon will not be disturbed unless upon review this court concludes that such discretion has been violated. Com. v. Carnes, 125 Ky. 821, 102 S. W. 284, 31 Ky. Law Rep. 464; Browder v. Com., 136 Ky. 45, 123 S. W. 328; Wallace v. Com., 167 Ky. 277, 180 S. W. 381. The complaint here is, not that the court violated a discretion in the matter, but that he had no authority to remove the case over objection to Lawrence county, because the latter was not contiguous. Since the record shows both lack of objection and in addition agreement, counsel cannot now complain; particularly so when they failed to suggest any county contiguous to Floyd, or one in the same judicial district. This question of jurisdiction was definitely determined, contrary to appellants' views, by our opinion in the case of Com. v. Kelly, 266 Ky. 662, 99 S. W. (2d) 774. There is a wide distinction between venue and jurisdiction. Where the venue is properly remanded, the statute fixes the jurisdiction.

We conclude that the complaint on the grounds advanced does not authorize a reversal.

A consideration of the alleged erroneous instructions requires a brief recital of the evidence. There are

some undisputed facts: The homicide occurred around 7 p. m., May, 1934. Layne and Meade were respectively chief and deputy police of Wayland. Castle was deputy sheriff of Floyd county. There is no dispute that either Layne or Castle, or both, fired the shot or shots which resulted in Martin's death. There can be little doubt that during the afternoon Martin had been engaged in the illicit sale of whisky, nor that he was armed during the melee.

Meade, the deputy policeman, late in the afternoon received a report that there was some shooting "up the road." He walked up to the ball park, near the point where the later trouble arose, and where he saw a mule hitched. He inquired about the shooting, and says he got "second information" that some one was in the neighborhood selling liquor. He went back into town and reported to Layne. Assuming that the police lacked the power to arrest beyond the town limits, the two got into Meade's car and took Castle with them. They then drove to the place near the ball park; Martin was standing by the mule, with the saddle pockets in his hand or in place on the mule. Near the point where the mule was standing, the road leading up Beaver creek divided. There were two roads known in the record as the "old" and "new," running parallel for a distance of about 300 yards, when they again joined. The space, with undergrowth, between the two at some points being not more than 15 or 20 feet.

When the three officers drove up to within a short distance, varying from 30 to 40 feet, according to various witnesses, Martin was getting on his mule, and as soon as he did this he turned and fired one shot toward the officer's car, and Castle got out and fired two shots in the ground and called to Martin to halt. He saw no liquor, but could hear the jars rattling in the saddlebags. When Martin fired his pistol, according to this witness, he proceeded on his mule up the old road; the officers, believing they could reach the far fork of the road before he did, took the new road. They encountered a mudhole, with the result that Martin was reaching the junction before the car. At a point near the junction, Martin also met some obstruction, and, seeing the approach of the officer's car, stopped his mule and began shooting at the car; witness saying that the car was hit two or three times.

As soon as Martin started shooting, both Layne and Castle commenced, with the result that Martin was shot twice, one bullet going into the back of the skull on the right side and lodging in the molar bone. The other wound showed a point of entrance or exit, the doctor would not say which, near the left of the back-bone, about the belt line, and a point of entrance or exit in the front toward the right. A pistol was found in the road some 15 or 20 feet from the road's junction and later picked up by one of the officers. It contained four or five empty hulls, and one empty chamber.

As to the initial encounter near the ball park, it was said by Meade that they had no search warrant or warrant for Martin's arrest. They saw him commit no misdemeanor, and the testimony does not show that deceased was advised that he was about to be arrested. Meade says that Martin was guilty of no offense until he "first fired at us." Layne's testimony substantiates the testimony of Meade as to what occurred at the opposite junction. Asked why he (Layne) shot, he replied: "Because he was going to kill us." Asked what violation of the law Martin had committed at the near fork of the road he replied: "He fired a shot." Up to that time the witness says that Martin had committed no offense in the presence of the officers, and the officers had no warrant. Castle, substantially, reiterates the testimony of the other officers. This witness in addition to other details says that when the officers got near Martin and his mule,

> "little James Martin started to run * * * and I saw Martin put a bottle in his saddle pocket; the car stopped, I got out, right foot on the ground; left foot on the running board. He jerked his bridle reins loose; jumped on his mule and fired a shot in the direction of the car. I hollered, 'Halt' and he said 'Go to hell', and ran his mule out the old road."

The remainder of the episode was detailed, substantially, as the other officers testified.

Numerous witnesses for the Commonwealth were introduced, showing that prior to the first encounter they had bought whisky from Martin. James Martin, the boy who ran when the officers approached, was one. These give quite a different version from that given by

the officers. The substance of that testimony was to the effect that they had seen Martin just before the first shooting and he had no weapon; that when the officer's car was within 30 feet of Martin, Castle got out; some witnesses saying he shot at Martin from one to three times while Martin was getting on his mule. Several witnesses testify to the foregoing state of facts as to what occurred at the "near junction" of the roads. All agree that Martin went the old road and the officers the new.

A different group of witnesses testify as to the occurrences at the "far junction", the testimony being somewhat conflicting, some saying that they heard the shooting at the "near junction" of the road, and very shortly thereafter saw Martin coming toward the "far" end, riding his mule hurriedly. Before he got to the junction, and with his back to the officers who were following him on the "new" road, and when they got in sight of Martin, the officers began shooting. The car stopped and two officers got out and fired more shots, and Martin fell into the road. Several of these witnesses testify that they saw no pistol in Martin's hand, and many say they did not see a pistol drop into the road after the firing of the shots by the officers, or at any time, nor did they see the mule "whirl around."

A number of witnesses testified for the defense, as did the officers, to the effect that, as Martin got within 20 or less feet of the "far junction" of the roads, he whirled on his mule and shot at the officers; some say once and others say more than once. Whereupon the officers shot from the car, and two of them jumped out and fired other shots. The foregoing is in substance the main testimony.

Under this conflicting evidence the court gave the jury five instructions. Instruction No. 2 was one correctly defining the technical words and phrases used. No. 5 was the usual reasonable doubt and lesser degree instruction. No. 1 was the usual murder and voluntary manslaughter instruction, embodying also the law as to principal and aider and abettor. Appellant's urgent criticism is of Instructions Nos. 3 and 4.

Instruction No. 3, substantially instructed that at the time of the homicide the appellants and Meade were duly accredited peace officers, and as such it was their

right and duty to arrest without a warrant any person committing a public offense in their presence, and all persons whom they reasonably believed to have committed a felony, whether in their presence or not. That upon information that intoxicating liquors were being sold or possessed, unlawfully, it was their right and duty to go in search of said alleged offenders, and they had the right and it was their duty to arrest Martin, if either of said offenses were committed in their presence, in which event it was the duty of Martin to submit peaceably to arrest.

The court further told the jury that if they believed from the evidence that when the accused, or any of them, approached the deceased, he fired a pistol at the officers, such shooting, under the circumstances, constituted a felony, in which event the defendants had the right to pursue Martin and to use such force as reasonably appeared to them to be necessary to effect arrest and overcome any resistance, even to the taking of the life of Martin, but the defendants had not the right to use unnecessary force or violence, nor to shoot or otherwise injure the said Martin, unless said Martin forcibly resisted said arrest, or the arrest could not otherwise be made, or if it appeared to defendants, in the exercise of a reasonable judgment, that it could not otherwise be made, and

"if you shall so believe, you will find the defendants not guilty. If, however, the defendants shot at Martin at the time when it was not necessary or believed so to be, in the exercise of a reasonable judgment, to protect themselves from great injury at the hands of Martin, or that Martin believed and had reasonable grounds to believe that it was necessary for him to shoot the defendants, or any of them in order to protect himself from danger, then the said Martin was not guilty of a felony and the defendant did not have the right to shoot or kill Martin upon the ground that he had committed a felony, and that it was necessary to shoot him or shoot at him in order to effect arrest."

Instruction No. 4, after setting out the law of self-defense in form as frequently approved by the court, contained a qualification which, in substance, advised the jury that, if they believed from the evidence, beyond a reasonable doubt, that the defendants, or any of them,

brought on the difficulty which made the real or apparent danger to them, they could not avail themselves of the self-defense plea, unless they had abandoned the difficulty and it was renewed by Martin in such a way as to put them in danger, in which event the jury should find them not guilty.

Instruction No. 3 was said to be erroneous, because it created in the minds of the jury the idea that Martin must have been guilty of a felony "before the officers had a right to pursue and to overcome resistance on the part of Martin, even to the taking of his life." Counsel is correct in his construction and the assumption that, if a felony had been committed in the presence of the officers, they had such rights as the court gave them under the instruction, and as we view the instruction it was far more favorable to appellants than they were entitled to under the proof.

It will be noted from the proof that at no time did the officers attempt to place Martin under arrest. They admit, of course, the absence of a warrant. They make no claim that they were attempting to arrest him for any violation of the liquor laws. Their only claim is that they pursued him because of his first shooting at them, and later shot him because he was endangering their lives or the lives of some one or more of their party.

Martin was at no time guilty of a felony committed in the officers' presence. We say this because this court has held unconstitutional section 1148a-7, Ky. Stats., which made it a felony to hinder or obstruct an officer in carrying out an official action. Loveless v. Com., 241 Ky. 82, 43 S. W. (2d) 348; Roberts v. Com., 241 Ky. 591, 44 S. W. (2d) 577. Nor is the shooting at without wounding in sudden affray a felony under section 1242, Ky. Stats.

Therefore, as we view the case, there was no felony committed in the presence of the officers. If there was a misdemeanor it consisted in Martin's act of shooting at the officers or having in his possession illicit liquor. In this case it is apparent that the officers had no opportunity to comply with section 39 of the Criminal Code of Practice, because from the facts, as they and others detail them, Martin's sudden action deprived them of that opportunity. Tuck v. Beliles, 153 Ky. 848,

156 S. W. 883. However, it must be remembered that, in arresting one for whom the officer has a misdemeanor warrant, or one who commits a misdemeanor in his presence, the officer has no right to kill the offender in attempting arrest, except in the exercise of self-defense. Nor is the officer permitted to kill the offender, if arrested only for a misdemeanor, in order to recapture him if he has escaped, but while the prisoner is in his custody he may use such force as may reasonably appear to be necessary to prevent the escape. Stevens v. Com., 124 Ky. 32, 98 S. W. 284, 30 Ky. Law Rep. 290; Smith v. Com., 176 Ky. 466, 195 S. W. 811; Reed v. Com., 125 Ky. 126, 100 S. W. 856, 30 Ky. Law Rep. 1212; Hickey v. Com., 185 Ky. 570, 215 S. W. 431; Com. v. Beverly, 237 Ky. 35, 34 S. W. (2d) 941.

The instruction given in advising that the act which Martin committed was a felony, was perhaps, an error. But we are clearly of the opinion that it was not error which prejudiced the rights of these defendants. On the other hand, it extended to them a right to kill Martin if he was fleeing from or resisting the officers, when, as a matter of fact or law he had, if an offense was committed in the presence of the officers, only committed a misdemeanor.

The second contention is that the law of self-defense, as applicable to encounters between private persons, does not apply as between an officer undertaking to make an arrest and a private person about to be arrested; that it is the offender's duty to submit to arrest unless he has reasonable grounds to, and does believe that the arresting officer is not acting in good faith in making the arrest. This may be a correct statement of the law, but in the cases cited above, where the arrest is attempted to be made for a misdemeanor, the law is said to be the same as between private citizens and an officer undertaking the arrest, and in this case we are persuaded that, from all the proof by the defense, it was only necessary for the court to have given an instruction embodying substantially the law of self-defense. Further, that under the facts, peculiar to this case, the modified instruction was properly given, and in a form that did not prejudice defendants, but extended to them all rights under their evidence. The further objection to the instructions (Nos. 3 and 4) are not well taken and need not be discussed. Taking the

instructions in their entirety, we are of the opinion that such as are complained of were more favorable, under all the circumstances, than the defendants were entitled to have had given for them. They protected their substantial rights in every respect. The case was fairly tried, and we do not perceive anything in the record which would justify us in ordering a reversal.

Judgment affirmed.